ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

THE PEOPLE *vs.* THE PRESIDENT AND DIRECTORS OF THE
MANHATTAN COMPANY.

The act incorporating the *Manhattan Company* in the city of New-York, au-
thorizing the employment of its *surplus capital* in the *purchase of pulic or
other stock,* or in *any other monied transactions* or *operations* not inconsistent
with the constitution and laws of this state or of the United States, and
such corporation having been created previous to any *restraining act* ren-
dering illegal banking by individuals, or by corporations not specially cre-
ated for banking purposes, the *Manhattan Company* has the right to carry
on *banking business.*

The *restraining acts* prohibiting incorporated companies not *expressly* author-
ized to carry on banking business, do not affect this corporation : the legis-
lature have in the same session, viz. in 1804, in which the first restrain-
ing act was passed, expressly excepted this company from its operation,
which *saving clause* has never been repealed ; the act of 1818 containing
a *proviso* that nothing therein contained shall be construed to abridge or
affect any rights *theretofore granted,* and the provisions of the *revised stat-
utes,* 1 *R. S.* 712 and 600, not applying to pre-existing corporations unaf-
fected by the previous restraining acts.

The *implied powers* of a corporation are as much beyond the control of sub-
sequent legislation, as *powers expressly* granted.

A *forfeiture* incurred by a corporation, by non-compliance with the terms of
a condition contained in its charter, may be *waived* by the legislature, by
*subsequent legislative acts* recognizing the continued existence of the cor-
poration.

The doctrine of *waiver,* however, is not applicable, where by the terms of a
grant or charter the estate or franchise *absolutely determines* upon failure
to perform a condition.

But even where the terms of a charter of incorporation are that on failure to
perform the condition the corporation *shall be dissolved,* judicial proceed-
ing must be resorted to and judgment of ouster had, to effect a dissolution ;
the mere failure to perform not being *ipso facto* a dissolution.

The incorporation in this case was granted upon the following condition :
" *Provided* that said company shall within ten years from the passing of
this act furnish and continue a supply of pure and wholesome water, suffi-
cient for the use of *all such citizens* dwelling in said city *as shall agree to
take it* on the terms to be demanded by the said company ; in default whereof
the said corporation shall be dissolved." IT WAS HELD, that the company be-
ing declared a body politic and corporate *in presenti,* and having *ten years* to
perform the acts required of them, the proviso was a *defeasance,* and not a
*condition precedent,* and that therefore they were not bound in their plea to
set forth the condition and allege performance, even for the purpose of shew-
in a *present right,* although at the time of the plea the period limited by
the proviso had long since expired ; as in judgment of law a corporation
once shewn to exist, is presumed to continue until the contrary be shewn.

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

*It was further held*, that the attorney-general in alleging a breach of the con-
dition was bound to *name such citizens as were willing to agree*, &c. and
that the naming of *one individual* would have been sufficient; also that he
should have averred a *request* on the part of those citizens who wished a
supply of water, or an *offer* to pay for it, or that the defendants had *notice*
of such willingness or desire.

*And further*, that alleging the breach in the general terms, that the defend-
ants "have not furnished or continued a supply of water sufficient, (or a
supply or any other quantity of pure and wholesome water,) for the use of
all such citizens dwelling in the said city of New-York as were willing and
desirous to agree for and take the same as aforesaid," was not the allega-
tion of a material fact on which issue could be taken—that it tendered an
issue upon an emotion or affection of the mind, which is not traversable or
susceptible of trial.

*It was further held*, that this being in the nature of a criminal case, the attorney-
general had a right to set up several distinct causes of forfeiture in his replica-
tion, the statute as to *replying double* not being applicable to criminal cases.

QUO WARRANTO. In October term, 1830, the attorney-
general filed an *information* in the nature of a *quo warranto*
against the defendants, charging them with using without
lawful warrant or charter the franchise of being *a body poli-
tic and corporate*, and of *carrying on banking operations*
without being authorized so to do. The information charg-
ed the *usurpation* for the space of eight months then last
past and upwards, in different forms: as, that the defend-
ants were interested *in an association* or company for the
purpose of receiving deposits, making discounts, issuing notes,
&c.; *in a bank* for the like purposes; that they claimed the
privilege of *employing a part of their effects* in, &c.; to *keep
an office* for the purpose, &c.; to issue bills and notes as
*private bankers*, and to *carry on banking operations*, such as
are usually employed and carried on by incorporated banks.

The defendants *pleaded*, that by an act of the legislature
of this state passed 2d April, 1799, entitled " An act for
supplying the city of New-York with *pure and wholesome
water*," they were created a body politic and corporate,
by the name of *The President and Directors of the Man-
hattan Company*, and were declared to be *forever there-
after* a body politic and corporate, to have continual suc-
cession, &c." that by the act, among other things, it was
enacted that it should and might be lawful for the com-
pany to *employ all such surplus capital* as might belong or
accrue to them, in the purchase of public or other stock, or

*in any* other *monied transactions or operations* not inconsistent with the constitution and laws of this state or of the United States ; that by a certain other act of the legislature, passed 25th March, 1808, supplementary to the act of 1799, it was enacted that the bills obligatory and of credit under the seal of the corporation of the company, which should be made to any person whatever, should be assignable by endorsement by the payee or his assignee, so as to enable the person holding the same to bring an action thereupon in his own name ; and that all bills or notes which might be issued by order of the president and directors for the payment of money to any person whatever, or his order, or to bearer, though not under the seal of the corporation, should be binding and obligatory upon the corporation, in like manner and with like force and effect as upon any private person, if made by him, and should be assignable and negotiable in like manner as if made by such private person ; that in and by the act of 1808 it was further enacted that the state should have the right to subscribe any number of shares to be held in the company not exceeding 1000 shares, at any time within 10 years from the passing of the act, and the capital stock of the company should be augmented to the amount of the shares so subscribed by the state, and that such act passed in 1808, and the act to which it was supplementary, was declared to be *public acts,* to be construed benignly and favorably, &c.   It was then averred, that on the 25th April, 1809, *the state* did subscribe to and become proprietors of 1000 shares of stock of the company, and from thence hitherto have continued to be and yet are the holders thereof, and *during all that time have received dividends semi-annually declared* in respect thereof, by the president and directors of the company, and *voted in the annual choice and election of directors* of the company. That afterwards, on the 17th April, 1816, the legislature passed a certain other act entitled, &c., whereby the comptroller was authorized to borrow $200,000, and out of the monies so to be borrowed was required to discharge the debts due from the state to the Merchants' Bank, *the Manhattan Company,* the New-York State Bank and the Bank of Albany, provided that the debts should only be paid to such of *the said banks* as should

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

loan a sum at least double in amount to the sum paid off. That afterwards, on the 24th April, 1823, another act of the legislature was passed, entitled, &c. repealing a certain portion of a previous act requiring the register or assistant register in chancery, resident in New-York, to keep an account with the bank of New-York relative to the matters mentioned in such act, and making it the duty of such register, &c. immediately upon the passing of the act of 1823, to withdraw whatever sum of money might be remaining to his credit in the bank of New-York, and to deposit the same in the Manhattan Company, in the city of New-York, and that thereafter the account of the register, &c. should be kept with *the bank of the said Manhattan Company.* It is then averred that the bank of the Manhattan Company in that act mentioned is the bank of the defendants, and that the assistant register of the court of chancery resident in the city of New-York did forthwith upon the passing of the act of 1823, comply with the directions of the same, and from thence hitherto hath deposited the monies belonging to or under the direction of the court of chancery in the bank of the Manhattan Company, and hath kept an account there as directed by the act. That by another act of the legislature, passed 21st April, 1818, entitled, &c. it is amongst other things enacted that if *any bank in the city of New-York* should make the loan of $1,000,000 contemplated by that act, on terms which, &c. *on condition* that a part or the whole of the *treasury deposits* collected in the city of New-York should be transferred to such bank, it should be lawful for the comptroller, with the advice of the governor, to direct the said deposits to be made in such bank. It is then averred that on the 1st July, 1818, the defendants made the loan contemplated by the act, and that thereupon in fulfilment of the condition the comptroller, with the advice of the governor, did direct the deposits in the act mentioned, to be made in the bank of the defendants, which deposits were accordingly made, and from thence hitherto have been continued to be made in the bank of the defendants to the credit of the treasurer of the state. That by another act of the legislature, passed 27th March, 1821, entitled, &c. it was enacted that certain banks in Albany should be the places of deposit for all monies which

might thereafter be in the treasury of the state, except such sums as might be deposited to the credit of the treasurer *in the Manhattan Bank,* and that it should be the duty *of the said banks* respectively to make monthly statements of the monies which should be received into and paid out of the said banks, on account of the treasury, and to deliver the same to the comptroller. That by a provision in the revised statutes, 1 *R. S.* 177, § 7, 8, 9, 10 and 11, it is, among other things, enacted by the legislature that the treasurer shall deposit all monies, &c. in such banks in the city of Albany, as, &c.; that all monies directed by law to be deposited *in the Manhattan Bank* in the city of New-York to the credit of the treasurer, shall remain in said bank, subject to be drawn for as the same may be required; that the comptroller may transfer the deposits in the Manhattan bank to the banks in Albany, in which, &c. so often, &c. but the comptroller may continue such deposit in the Manhattan Bank, if the said bank shall pay a rate of interest to the state for such deposits equal to that paid by the banks in Albany, in which, &c.; that the monies so deposited shall be placed to the account of the treasurer, and he shall keep a bank book in which shall be entered his account of deposits in, and monies drawn from, the banks in which such deposits shall be made; the said banks shall transmit to the comptroller monthly statements, &c. &c. It is then averred that from the 1st July, 1818, deposits of monies belonging to, or on account of the people of this state, in the city of New-York, have been and continued hitherto to be made in the bank of the defendants to the credit of the treasurer, and an account during all that time kept running between the president and directors of the Manhattan Company and the treasurer of the said deposits from time to time made, and of the payments, &c., and that since the 27th March, 1821, the defendants have made and delivered to the comptroller monthly statements &c.; *wherefore* the defendants say that from the time of the passing of the first mentioned act, hitherto, they have been and continued to be and still are a body politic and corporate in fact and in name, and are and claim to be entitled to do all lawful acts, and for all the time in that behalf in the said information mentioned have used, and still do use, the

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

liberties, privileges and franchises of being a body politic and corporate in law, fact and name, by the name of the President and Directors of the Manhattan Company, and by the same name to plead and be impleaded, answer and be answered unto, and to have a common seal; and by the same name to employ the *surplus capital* belonging or accruing to the said company, in the purchase of public or other stock, or in any other monied transactions and operation not inconsistent with the constitution and laws of this state, or of the United States, for the sole benefit of the said company; and by the same name *to employ a part of the effects of the company*, and be interested in a fund employed for the purpose of receiving deposits, making discounts and issuing notes and other evidences of debt, to be loaned and put into circulation as money, by employing therein the *surplus capital* belonging or accruing to the said company; and claim to have, use and enjoy the liberties, privileges and franchises of being body politic and corporate in law, fact and name, by the name aforesaid, and by the same name to keep an office for the purpose of receiving deposits and discounting notes and bills, and issuing evidences of debt to be loaned and put in circulation as money; and also by the same name to issue bills, promissory notes and other evidences of debt for the purpose of loaning them and putting them in circulation as money; and also of issuing notes and bills, and putting the same into public circulation as money, receiving deposits, making discounts, and carrying on banking operations, such as are usually performed and carried on by incorporated banks; and that they have claimed and yet do claim to have, use and enjoy all the liberties, privileges and franchises to them belonging, by virtue of the several acts and statutes aforesaid, and the other aforementioned premises, as it was and is lawful for them to do, *without this*, &c.; all which, &c. they are ready to verify, &c. whereupon they pray judgment, &c.

To which plea the attorney-general put in *two replications:* 1. That by the act entitled "An act for supplying the city of New-York with pure and wholesome water," passed 2d April, 1799, it was enacted and *provided* that the Manhattan Company should within *ten years* from the passing of the act furnish

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

and continue a supply of pure and wholesome water, suffi-
cient for the use of all such citizens dwelling in the said city
as should agree to take it on the terms to be demanded by
the company ; in default whereof the corporation should be
dissolved ; and that by an act passed in 1808, supplemen-
tary to the act of 1799, it was further enacted that the time
specified in the proviso contained in the seventh section of
the act of 1799, should be and thereby was extended to ten
years from the passing of the act of 1808, and that *although
a great number of citizens* dwelling in the city of New-York,
had at all times since the passing of the act of incorporation
*been willing and desirous* to agree for and take from the
president and directors of the Manhattan Company a supply
of pure and wholesome water sufficient for the use of such
citizens on such reasonable terms as should be demanded by
the company, *yet the president and directors of the company
had not at any time since the passing of the act of incorpor-
ation furnished or continued a supply of water sufficient for
the use of all such citizens dwelling in the said city as were
willing and desirous to ageee for and take the same* as afore-
said, and this, &c. wherefore, &c. ; and 2. That the presi-
dent and directors of the Manhattan Company have not at
any time since the passing of the act of incorporation fur-
nished or continued *a supply or any other quantity of pure
and wholesome water for the use of all such citizens dwelling
in the city of New-York as were willing and desirous to agree
for and take the same* as aforesaid, and this, &c. wherefore, &c.

The defendants *demurred* to the replications, and specially
alleged as causes of demurrer to the first replication, 1. That
it is not set forth *what citizens* dwelling in the city were willing
and desirous to agree for and take a supply of water, or that
such citizens ever *requested* the president and directors of the
company to furnish and continue to them such supply, or ever
*offered to agree* for, or take the same on such reasonable terms,
&c. or that the president and directors of the company ever
had *notice* of the supposed willingness or desire of such citi-
zens to agree for and take the same ; 2. That the replication
is a *departure* from the information in this ; that in the infor-
mation it is assumed that the defendants are a body politic
and corporate ; and it is alleged that they have usurped cer-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

tain franchises, &c. ; whilst in the replication it is sought to be shown that the coporation has ceased to exist as a body corporate or politic, by reason of an alleged non-compliance with the proviso in the replication referred to ; thereby shewing that the information ought to have been filed against the *individuals* assuming to act as a corporation, and not against the defendants as a body corporate ; and 3. That no issue capable of trial can be taken thereon. The special causes of demurrer to the second replication are, 1. That it does not set forth or shew *any citizens by name, or in particular, who were willing and desirous* to agree for and take a supply of water, &c. ; or that such citizens ever gave *notice* of their willingness or desire, or ever *requested* the president and directors of the company to furnish or continue to them a supply of water on such terms, &c. or in any way whatever ; 2. A departure is assigned as in the special causes of demurrer to the first replication ; and 3. That no issue capable of trial can be taken ; and to both replications the special cause of *duplicity* is assigned as containing two separate and distinct breaches of the proviso mentioned in the replication ; whereas only one breach ought to have been alleged. The attorney general joined in demurrer.

The cause was argued by *B. F. Butler*, and *S. A. Talcott*, for the defendants, and by *G. C. Bronson, Attorney General* and *D. B. Ogden*, for the people.

### Arguments for the defendants :

The plea shews that the defendants were duly incoporated, and that they have good title to be a *corporation*. The principal question, however, is whether the defendants have a right to exercise the other franchises claimed in the plea, viz. *to carry on banking operations*. The original act of incorporation is entitled " An act for supplying the city of New-York with pure and wholesome water." The title does not import that the act was passed for the purpose of conferring banking powers ; but if it does not help, it cannot hurt. 2 *Cranch,* 386, 401, 2. There is no prohibition in the act against *banking* and in 1799, when this company was incorporated, all corporations authorized to carry on monied operations

might engage in banking business. 15 *Johns. R.* 370. The right to pursue such business was common to all the community until 1804, when it was partially restrained. In 1818, it was prohibited as well to corporations not expressly authorized, as to individuals. By the 8th section of the act of 1799, the company were empowered to employ their surplus capital in *any monied transactions or operations*, not inconsistent with the constitution and laws of this state or of the United States, and this power being conferred previous to the passage of the restraining acts, gave the right to carry on banking operations : for as *Lord Coke* says, charters must be construed as the law was understood when the charters were granted. 2 *Inst.* 282. The defendants were authorized to employ such surplus capital " for the sole benefit of the company." The power was granted not as subsidiary to the duty of supplying the city with water, but solely for the benefit of the company. When the charter was granted it was understood to confer banking powers ; its terms are broader and more comprehensive than that of the *Utica Insurance Company*, which it was admitted by *C. J. Thompson* , would have conferred the right to bank, but for the restraining acts. 15 *Johns. R.* 381. It cannot be said that the company could not employ their surplus capital in banking until after they had supplied the city with water ; their capital was $2,000,000 ; by the original act of incorporation they had 10 years with which to supply the city with water, and this limitation by the act of 1808, was extended for 10 years longer. During this period of 20 years, they were not obliged to permit their capital to lie unemployed ; and whatever sum was unapplied to the operation of bringing water into the city, was surplus capital, within the meaning of the act. In 1808, the legislature knew that the city had not been supplied with water, and yet they authorize the company to take mortgages for debts owing to them, and expressly give effect to bills or notes which should be issued by them payable to order or *bearer*, though not under the seal of the corporation. This provision shows that the legislature knew that the company were then employing their capital in banking operations, and it removed all doubt as to their right to issue bills payable to bearer, which had existed under the act

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Manhattan Co.

ALBANY,
Oct. 1832.

The People
v.
President &c.
of the Man-
hattan Co.

concerning prommissory notes. 1 *R. L.* 151. It had been supposed that the act concerning promissory notes did not include notes made *by* corporations,. although it did notes made *to* them. The English statute, 3 *and* 4 *Ann, ch.* 9, embraced both, ours did not. In 1 *Cowen* 513, it was inti-mated that a note *by* a corporation would be good, but the opinion was not called for by the case under consideration ; the act of 1808 put the question at rest, as to this company. That the legislature knew at the passage of the act of 1808, that the company were employing their capital in banking operations, and that they recognized their so doing as a proper and legitimate exercise of their powers, is manifest from the provisions of the 9th section of that act, by which the company are authorized to transfer the duty of supplying the city with water to the corporation of New-York ; and yet by the same section, notwithstanding such transfer, although the period of its existence as a corporation was limited, it was to endure for 30 years, and for what possible purpose continued other than to carry on its banking operations, is inconceivable. Besides, by this act the capital of the company is extended 1000 shares, and the right claimed by the state to become stockholders to that amount, as the consideration probably for the privilege granted ; and in pursuance of the right thus claimed, the state took the stock, and from that time until now have been partners with the defendants and participated in the profits of the banking business. Can it now be permitted to the state to say that the power claimed by the defendants does not exist ? All the acts of the legislature, subsequently passed, set forth in the plea recognize the defendants as an *existing corporation* and a *banking company.* *Cowp.* 805. 2 *New Hamp. R.* 121. 10 *Mass. R.* 155. *Coke Litt.* 295. They are *legislative constructions* of the original act of incorporation, and being in *pari materia,* are to be construed together. Those acts also operate as a *confirmation ;* a confirmation either express by deed or implied by law. *Coke Litt.* 295. 3 *Harg. St. Tr.* 545. 8 *Cobb. Parl. Deb.* 1039. In the case of *The King* v. *The City of London,* the defendants pleaded various recognitions and confirmations by the crown, and they were admitted to be well pleaded. 3 *Burr.* 1870. 3 *T. R.* 232. These

statutes would of themselves have conferred banking powers, had they not been granted by the original act. No particular form of words was necessary to confer such powers, it was only necessary to shew the *licence* or *consent* of the government. 10 *Co.* 30. 1 *Kyd*, 39, 41, 63. *Angel & Ames*, 40, 45. 2 *Johns. C. R.* 324. 2 *Wendell*, 133. *Dyer*, 100, *a.* *Cro. Eliz.* 35. 4 *Peters*, 502. *Com. Dig. tit. Franchise, F.* 6. In the incorporation of a bank it was formerly not usual to define or limit its powers; such powers were given as were usually exercised by banks, and a general act declaring a corporation to be a *bank,* would confer all the usual powers of a bank. By such general words was the *Bank of England* created, as was also the *Bank of America,* in this state. It was not until 1825, that the legislature defined and limited the powers of corporations created for banking purposes.

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

After the long continued possession and use of these franchises with the knowledge and assent of the legislature, it is too late for the government to question the title of the corporation. In the case of the *Utica Insurance Company,* the legislature did interfere and direct a *quo warranto;* whereas in relation to this company they authorized a negotiation with them, treating them as a bank, and directing the deposits of the public monies in its vaults. The franchises sought to be taken away have been exercised for 30 years; and although in England such a lapse of time would not be held sufficient to authorize the presumption of a charter, it should so be held here. As between individuals, admissions and recognitions, such as are set up in this case, would be conclusive, and why should not the same principle apply to the government? Cotemporaneous and long continued usage is evidence against the crown as to the claim asserted. 2 *Inst.* 282. In *Massachusetts* it has been held that a corporation will be *presumed,* 7 *Mass. R.* 547, 12 *id.* 400; and in *Maryland* it has been adjudged, where corporate powers have been exercised for a length of time with the knowledge of the government, a grant will be presumed. 5 *Harris & Johnson,* 122. Acts of parliament are the highest species of evidence, and recitals or admissions of facts contained in them, are evidence to prove the

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

existence of such facts against individuals; and if so, *a fortiori* are they against the government. *Stark. Ev. part* 2, § 41, 43. *Comyn's Dig. tit. Franchises, B. C. Coke Lit.* 19, *b.* 4 *Maule & Sel.* 532. 2 *Str.* 1066. The sovereign authority of the state not only spoke of this company as a bank, but in the regulations for conducting its financial affairs made it one of its agents, and in addition partook of the profits accruing from its business as a bank. Corporations are affected by the acts of their officers, 12 *Wheat.* 70, and a state is estopped by its admissions. 10 *Mass. R.* 155. In England an information would not be permitted to be filed against a corporation which had been in the exercise of its functions for 20 years. *Angel & Ames,* 484. 4 *Burr.* 1963. 3 *T. R.* 210. *Cowp.* 59.

The *restraining acts* passed in 1804 and since do not apply to this company, and cannot impair or affect their rights. The first restraining act, passed in 1804, it is insisted, did not apply to incorporated companies, although this court held otherwise in the case of *The People* v. *The Utica Insurance Co.* 15 *Johns. R.* 358. The language of the act is, that *no person unauthorized by law* shall, &c.; it is a *penal* statute, and should be construed strictly; it takes away or abridges pre-existing common law rights, 7 *Mass. R.* 523; 16 *Johns. R.* 7; 2 *Stra.* 1241; *Esp. on Penal St.* 19, 20; 4 *Mass. R.* 471; 14 *Johns. R.* 206; but, at all events, that act did not affect the defendants, and was not intended to affect them, as the legislature declared by a provision in an act passed during the same session of the legislature, incorporating the *Friendly Union Society* in the city of Albany, 3 *Laws of N. Y.* 611, *Web. & Sk. ed.* The act of 1804, re-enacted in the revision of 1813, 2 *R. S.* 234, has since been repealed, but the *saving clause,* exempting this company from its operation, has never beeen repealed. The next restraining act, passed in 1818, expressly saves rights previously granted to all incorporated companies. The revised statutes, (1 *R. S.* 712,) embody the provisions of the acts of 1804 and 1818, but they cannot affect the rights of incorporated companies which had then become vested; indeed, it is supposed that the 5th section of the repealing act, 2 *R. S.* 779, contains in effect the saving clause of the act of 1818. If it shall be said that the provision in the re-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

vised statutes that no corporation created or to be created and not expressly incorporated for banking purposes shall carry on banking operations, 1 *R. S.* 600, § 4, is stronger than any previous provision on the subject, the answer is that it cannot affect this corporation, which, in the same act, 1 *R. S.* 177, § 9, is recognized as *a bank*, and the public monies directed to be deposited in its vaults. The provision was not intended to apply to this or any other pre-existing corporation not affected by prior restraining acts ; but if so intended is unconstitutional and void, as interfering with the vested rights of the company. Full force and effect can be given to the revised statutes, without making them retrospective by applying them to corporations, in the creation of which, the right was reserved by the legislature to modify, alter or repeal the charters granted, or to such corporations as might, in consequence of the repeal of the old restraining law, claim the right of banking ; but it cannot be extended to this corporation under the circumstances of this case.

The counsel insisted that the replications were bad, and urged that the prosecution being of a penal character, seeking the enforcement of a forfeiture, the defendants had a right to insist upon the utmost strictness in pleading, *Com. Dig. tit. Pleader,* C. 176 ; *Esp. on Pen. Stat.* 19,20 ; 2 *Mass. R.* 444 ; 4 *id.* 471 ; that the allegations in the replications were too general—*the names of the citizens* who were willing to agree for a supply of water should have been given, so that the defendants might have taken issue upon the allegations, 1 *T. R.* 752 ; 19 *Johns. R.* 349 ; that *notice* of the willingness to take water, or a *request* to be supplied with it should have been averred, 1 *Chit. Pl.* 285, 291 ; *Com. Dig. tit. Pleader,* C. 69, 73 ; *Lawes on Pl.* 207 ; *Cro. Eliz.* 250 ; *Cro. Jac.* 433 ; 2 *Lilly's Pr. Ent.* 239 ; 5 *Vin. Abr.* 193, *tit. Condition, D. B.* 270, *pl.* 11 ; 273, *pl.* 28 ; 275, *pl.* 33 ; *Bac. Abr. tit. Condition,* O. 2 ; *Comyn's Dig. tit. Condition, L.* 8, *L.* 10 ; 1 *Saund.* 287, *n.* 16 ; that the replications aver no material fact, on which a certain or sufficient issue can be taken ; had issue been taken, it would have been an issue on an affection or emotion of the mind, not on a fact susceptible of trial, 19 *Johns. R.* 372 ; *Com. Dig. tit. Pleader,* G. 7 ; *Lawes on Pl.*

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

207 ; 1 *Brownl.* 231 ; that the replications are double and multifarious, a plaintiff not being at liberty to reply *double* without leave given. 2 *R. S.* 356, § 27. That the breach is larger than the condition on which it is founded—the proviso being that the defendants. shall furnish and continue a supply of pure and wholesome water sufficient for the use of all such citizens as *shall agree to take it*, and the breach is, that the defendants did not furnish a supply to all such citizens as *were willing and desirous to agree for* and take the water, 1 *Chitty's Pl.* 293 ; 13 *Serg. & Rawle,* 186 ; that the plea shews a valid *dispensation* and *waiver* by the legislature of all causes of forfeiture under the *proviso,* and though the duty to supply the city with pure and wholesome water may still continue, because that was one of the objects of the act of incorporation, the attorney general cannot, as he now attempts to do, avoid the charter for want of a strict compliance with the proviso, but must proceed against the corporation upon the ground of a *non-user* or neglect of *general duty,* for such a length of time as may be sufficient to produce a forfeiture, when such time shall have elapsed. In support of the last position, the counsel insisted upon the doctrine of waiver for forfeitures incurred by tenants for non-payment of rent, where the landlord after notice sues or distrains for rent in arrear, and cited 3 *Co.* 65, *a ; Croke Eliz.* 528 ; 5 *Cowen,* 448 ; 1 *Ball & Beat.* 554 ; 3 *T. R.* 151. They insisted that the evidence of knowledge by the government of the non-performance of the proviso, and of subsequent recognition of the defendants as a corporation, was much stronger and more conclusive than in the cases of landlord and tenant, cited by them ; as here, the state since 1808 had been corporators, participating in the management of the concerns of the company and sharing in its profits ; that under such circumstances, the government should not be allowed to allege ignorance of the cause of forfeiture, if any existed, and on the contrary, should be concluded by their acts, as upon the faith of them the public had been induced to vest their property in the stock of the company. That nothing could be claimed for a non-compliance with the proviso contained in the original act, extended by the subsequent act until 1818 ; that if the condition was not complied with at the ex-

piration of the limited time, it could not subsequently be performed, and all that remained for the state was to enforce the forfeiture. Instead of doing so, the state had repeatedly recognized the company as an existing corporation, and thereby waived the forfeiture. The condition therefore was gone, and the only ground upon which the corporation could now be proceeded against was for *non-user* or *neglect of duty* in not accomplishing the objects of the incorporation.

ALBANY,<br>
Oct. 1832.<br>
The People<br>
v.<br>
President, &c.<br>
of the Man-<br>
hattan Co.

*Arguments for the people :*

The replications are well pleaded, and shew that the defendants have forfeited their corporate privileges. *First.* They have forfeited them by not performing the condition upon which the continuance of the corporation depended. In every grant creating a corporation, there is an *implied* condition that the object of the incorporation, or purpose for which it was created, shall be accomplished ; and on failure, that the corporation shall or may be dissolved. Here, however, there is an *express* condition or proviso extending down to 1818, (for the limitation in the act of 1808 was rather an extension of the old than the creation of a new restriction)— a condition in *deed*, and not merely in *law*. In grants from the sovereign authority of a state, words will be construed to create conditions which will not be so considered in private grants. *Comyn's Dig. tit. Condition, A.* 2, 3. *Littleton*, § 328, 29, 30. What is said in the replication as to the willingness and desire of the citizens to take a supply of water, is but inducement to the breach that the defendants have not furnished good and wholesome water to such as were ready and desirous to take it ; the breach is as broad and no broader than the proviso.. It was not necessary to name the citizens who, &c. it is enough that the breach covers the words or the spirit of the condition. The pleadings do not shew that the corporation have ever done any thing to carry the objects of its incorporation into effect, and under such circumstances it was not necessary to specify names. Besides, it is a general rule, where a subject comprehends multiplicity of matter, that general pleading is sufficient. 5 *Johns. R.* 172. 1 *Bos. & Pul.* 640. 8 *T. R.* 459. 1 *Chitty's Pl.* 240. *Notice* or *request* need not be averred, nei-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

ther being parcel of the condition; nor did the facts lie peculiarly within the knowledge of the party pleading; on the contrary, they were emphatically within the knowledge of the defendants. 1 *Chitty's Pl.* 320. *Com. Dig. tit. Pleader, C.* 73, 75. It was the business of the defendants to set up a want of notice, if that would have been an excuse for them; it was sufficient, on the part of the prosecution in the first instance, to aver a breach in general terms. An issue on the allegations in the replication would not have been an issue on an affection of the mind, as insisted on the other side. The defendants might have rejoined that they had furnished water to all who were willing to take, and the rest would have been matter of evidence, not of pleading; and in such case it would have been proved that a great number of citizens had applied for water and been refused. The objection that the replications are double cannot be sustained; a *quo warranto* being in the nature of a criminal proceeding, the attorney general may plead or reply as many distinct causes as he thinks proper. The statute, in relation to replying double, does not affect criminal cases; it is an enabling statute, and does not take away rights previously existing. At all events, to reply double without leave is an irregularity which can be taken advantage of only by motion, and not on demurrer, which assumes that though each replication is a good answer to the plea, both united are not such an answer. Nor is the breach larger than the condition. On the part of the prosecution, it alleges an omission on the part of the defendants to do what it is contended is the true intent and meaning of the act of incorporation; if such is not its spirit and intent, then the breach may be broader than the condition: that presents the question, what is the construction of the act?

But the replications are sufficient to shew the *non-user* of the franchises, no matter from what cause. The defendants have failed to perform the purposes for which they were incorporated, and although it may have happened without their fault, the corporation must be dissolved; it dies a natural death. The pleadings admit that the defendants have failed to furnish a sufficient or any quantity of water, the express condition and the only object of their creation and existence. 4

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

*Mod.* 57, 8. 12 *id.* 17, 18. *Skinn.* 310, 11. 9 *Cranch*, 51, 2. *Comyn's Dig. tit. Franchises,* 93. 12 *Mod.* 271. 1 *Ld. Raym.* 499. 5 *Mass. R.* 230. 5 *Johns. C. R.* 379. 19 *Johns. R.* 456. 3 *T. R.* 244. *Angel & Ames,* 501, 10, *Wilcock on Corp.* 344. Independently of the condition, it may be dissolved now for *non-user* of its franchises. Since 1818, there has been no legislative extension or dispensation to effect the *main object* of the incorporation, to wit, the supplying the city with pure and wholesome water; every other object was incidental and consequential. The corporation was created upon the trust that the end of its institution should be accomplished. It is no answer for the defendants to say that they could not accomplish it; if they could not, no matter for what cause, they ought not to exist. It is said, however, that the legislature have dispensed with or varied the condition by the recognition of the corporation after its known failure to supply the city with water; that the state had become a fellow corporator, and of course had notice of the forfeiture. The speaking, by the legislature, of this company as an existing corporation does not shew that they knew of the forfeiture, nor does the fact of the state being a stockholder shew such knowledge. When a state becomes interested as part owner in a company, they are not stockholders in their sovereign capacity, but *quasi* individuals. The people of the state cannot be prejudiced by such a transaction. 9 *Wheaton*, 904. Nor can an act of the legislature, passed for a collateral purpose, as for instance directing the financial officers of the state to deposit the public monies in a particular bank, be considered a dispensation of a condition or proviso; it is a mere recognition of a coporation *de facto,* which may exist until abrogated. The defendants also forfeited their corporate privileges by an abuse of them, by carrying on banking operations, which they were not authorized to do. Exercising powers not granted is a cause of forfeiture, *Comyn's Dig. tit. Condition, R.*

The *plea is bad,* because it does not shew a performance of the condition upon which the continuance of the corporation depended. The defendants are called upon to shew by what warrant they claim the liberties, privileges and franchises exercised by them; in other words, to shew a present and sub-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

sisting right. · It is no answer to say they have a charter, if that charter be granted on condition, unless a compliance with the terms of the condition be shewn. *Comyn's Dig. tit. Quo Warranto*, 2, c. 2. 2 *Inst.* 279, 282. 2 *T. R.* 566. *Cro. Jac.* 313. The information asserts no right on the part of the people, but calls on the corporation to shew their title, a *present title*, embracing of course a performance of every condition. The act of 1799 is declared to be a public act; the court, therefore, will judicially notice its contents. The grant is made upon a condition, and in default of performance, the act declares that the corporation shall be dissolved ; not that the charter shall be forfeited, but that the corporation shall be absolutely dissolved, and at an end. Instead of averring performance, the plea does not even pretend a performance, and in addition admits an abuse of the franchises granted.

Whether the defendants are *now* a corporation or not, they have *usurped the banking privileges* exercised by them. No such power is conferred by their charter ; and no one on reading the act can believe that it was the intention of the legislature to confer it. If it exists it was obtained by fraud. The defendants are called upon to shew their right to the banking powers exercised by them for *eight months preceding October*, 1830. They answer by setting up various acts of the legislature recognizing them as a bank, and allege that they have exercised all the powers of a bank from the commencement of their charter. The answer to which is, that *usurpation* confers no right against the sovereign power of the state. Again ; they say that the company were expressly authorized to employ their *surplus capital* in any monied transactions or operations not inconsistent with the laws. Admitting it to be so, no authority was conferred to employ their whole .capital in banking, or in any other business different and distinct from the main object of the act. Surplus capital is that which is left unexpended of the whole capital, after the purposes have been accomplished for which the institution was created. The power to employ it is incidental, or consequential, and when the main object fails, the incident also fails. The construction given by the defendants to this power would authorize them to insure, to trade, and in short to engage in any

business in which money could be advantageously employed ; such construction it is contended is unwarranted, especially when applied to a mere collateral and incidental power. A corporation is an artificial body—a creature of the legislature ; it has no powers but such as are given to it, either at the time of its creation or subsequently, or as are incidental to those granted ; it can have no capacities other than such as are necessary to carry into effect the purposes for which it was established, and no power is to be conceded to it by *implication* but such as is indispensable to the accomplishment of the main object of its creation; and when the mode of exercising its powers is prescribed, such mode cannot be departed from. 2 *Cowen,* 709. 5 *Wendell,* 217. 5 *Conn. R.* 560. 4 *Wheaton,* 636. 4 *Peters'* 168. 3 *Barn. & Ald.* 1 *Angel & Ames,* 139. 2 *Cranch,* 166. 2 *Johns. R.* 109. Had the legislature intended to have created this company a *bank,* they would have said so, and used appropriate terms, as had previously been done in the incorporation of the New-York Bank, the Albany Bank and the Bank of Columbia. Every thing contained in the charter of this company may have full efficacy given to it without conceding to it the right to bank. It was created for the purpose of supplying the city of New-York with pure and wholesome water ; that was the specific object of its incorporation, and any general terms found in its charter must be construed with a view to such special object. 15 *Johns. R.* 383. 9 *Cowen,* 501. 4 *Peters,* 168, 171. The company may do whatever is necessary to further the main purpose of the institution, but beyond that they cannot go, or their power will be unlimited. The powers of this company, instead of being broader, are more limited than those of the *Utica Insurance Company,* that being authorized to employ all its capital, this only its surplus; and yet that charter was adjudged not to confer banking powers. 15 *Johns. R.* 358. The power of employing *surplus capital* cannot upon any construction extend to the receiving deposits and issuing bills or notes and putting them in circulation as money ; those are modes of operating upon credit, not employing capital already existing. Besides, the plea does not shew that there is a *sur-*

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

*plus capital;* it should have been averred that the main ob-
ject of the act had been accomplished, and that a surplus
was left; and notwithstanding the defendants claim not only
to use a surplus not shewn to exist, but to use their *whole
capital* in banking operations.

The act of 1808 did not confer banking powers. The
sixth section, which is the only one affecting this question, is
*conditional,* and confers no powers, but in the event of a
transfer to the corporation of New-York of the duty to sup-
ply the city with water; which transfer is not pretended to
have been made. But if *unconditional,* it only extended to
such bills and notes as might be issued in carrying into exe-
cution the specific powers granted to the corporation, and
not to bills and notes issued in the way of banking. It did
not authorize the engaging in any new business not warrant-
ed by the charter; it only gave new means and facilities of
exercising the powers previously granted. At the passage
of this act it was doubted whether a corporation could bind
itself by simple contract; and to obviate that doubt, the
power to issue notes was given, not for banking purposes,
but for the more convenient transaction of their business as
a water company. Subsequently, in *Danforth* v. *The Scho-
harie Turnpike Road Company,* 12 *Johns. R.* 227, it was
held that *assumpsit* would lie against a corporation on an im-
plied promise; and in *Mott* v. *Hicks,* 1 *Cowen,* 513, it was
adjudged that a corporation may bind itself by contract with-
out its corporate seal, and give a promissory negotiable note,
while in England, as late as the case in 3 *Barn. & Ald.* 1, it
was held that a corporation can be bound only by seal. Eve-
ry corporation in this state may therefore by force of the
general law, contract by promissory negotiable notes in re-
lation to the legitimate objects of their several incorporations,
but having that power does not authorize them to engage in
a business not within their charters. So here, the authority
conferred upon the defendants by the act of 1808, to *issue bills*
and notes payable to order or bearer, did not authorize them
to engage in banking. There is a material difference between
the right to issue negotiable paper and the right to carry on
banking operations; every individual may do the one, but not
the other. The fact of the state becoming a stockholder does

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

not prove that the legislature considered this a banking com-
pany; it was a water company, and there is nothing to shew
that the dividends paid to the state were derived from bank-
ing operations. The other statutes set forth in the plea con-
fer no additional franchises upon the corporation; they au-
thorize the comptroller to borrow money from the corpora-
tion; they call it a bank, and authorize deposits in such bank.
The act authorizing deposits give the corporation the capa-
city to do the particular thing authorized, i. e. to receive the
deposits of the state, but not the deposits of individuals, or to
exercise any other banking power. Directions to make the
deposits of the state with a bridge or ferry incorporation, or
with a mercantile firm, would not have conferred banking
powers upon such corporation or firm. License to an alien
to accept a grant of land gives power to his heirs to inherit
in that particular case, but not from any one else. 20 *Johns.
R.* 706. Nothing is to be inferred from the company *lend-
ing* money to the state, for that was within the scope of their
legitimate powers; nor can the calling them a bank confer
by implication banking powers—it was a mere misnomer,
the corporation were incidentally so named, and not for the
purpose of designating its character, or conferring powers
upon it. Nor can it be pretended that any thing contained
in those statutes shall operate as a *confirmation.* A con-
firmation can be only by express grant; it presupposes a
previously existing right. Here was no previous right—
there was nothing to confirm.

If the defendants were ever warranted in carrying on
banking operations, they are now prohibited from doing
so by the *restraining act.* Without waiving the acts of 1804,
1813 and 1818, the provisions of the *revised statutes* are con-
clusive upon this question. These statutes, in reference to
this subject, were passed in 1827, and went into effect in
1828. The 3d section of 1 *R. S.* 712, declares that " no
incorporated company *without being authorized by law,* shall
employ any part of its effects or be in any way interested in
any fund that shall be employed for the purpose of receiving
deposits, making discounts or issuing notes or other evidences
of debt to be loaned or put in circulation as money;" also, in
page 600 of the same volume, section 4, it is enacted that
"no corporation created or to be created, *and not expressly in-*

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

*corporated for banking purposes,* shall by any implication or construction be deemed to possess the power of discounting bills," &c. It has been said on the other side, that these provisions do not apply to the Manhattan Company, because in the same portion of the statutes at page 177, § 9, the company is called a bank, and deposits of the public monies are authorized to be made in the Manhattan Bank. This again is but an incidental naming in the statutes of this corporation as a bank; and on a subject relating to the duties of the treasurer of the state, having no reference whatever to the conferring of banking powers upon the company. But if there is a conflict between these different parts of the statutes, the provision in page 177 must yield to the provisions in pages 600 and 702, for it is expressly declared " that if any provisions in the different parts or chapters are repugnant to each other, that which shall be the last in the order, (herein before declared) shall prevail; and so much of any prior provision, as is inconsistent with such last provision, shall be deemed repealed thereby." 2 *R. S.* 778, § 12. Again, it is said that any act *restraining this company from banking,* is unconstitutional, as interfering with vested rights and violating the obligation of a contract. Previous to the restraining acts, banking was a common law right in individuals, but not in corporations. Corporations have no common law rights; all the rights which they possess are such as are granted, or necessarily incident to carry into effect the objects of their incorporation. But assuming that independently of the restraining acts of 1804 and 1818, this company had the same right with individuals to employ their surplus capital in banking, the revised statutes do not violate any vested rights. The company had authority by the original act of incorporation to employ its surplus capital in the purchase of public or other stock, or in any other monied transactions or operations, not inconsistent with the constitution and laws of the state. The right was to be exercised subject to the laws of the state, as well those existing at the time of the passage of the act of incorporation as such as might subsequently be enacted. The clause, therefore, is equivalent to an express reservation of the right to modify; and the modification applies not to the main object for which the incorporation was granted, but to incidental and

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

collateral powers, which of course are subject to such altera-
tions in the laws of the state as in the opinion of the legisla-
ture public policy and the general welfare demand. Had
the power of banking been expressly granted, it would have
been a part of the contract, and the legislature could not
have interfered with or impaired it. But not so here ; the
company claimed the power to bank as merely incidental,
having no greater or better rights in this respect than had
any individual in the community. But even in relation to
powers specifically granted to corporations, the legislature
have the right to pass laws materially affecting their interests.
Have they not the right to regulate the rate per cent. which
may lawfully be demanded on the loan of money ? May
they not tax banks ? And cannot this be done as well in re-
lation to existing as to future corporations. The legislature
also have the constitutional right to modify powers granted
to corporations and to regulate their exercise, although they
cannot abolish or abrogate them. 4 *Wheaton*, 235. 8 *Mass.
R.* 445. 4 *Cowen*, 384. 9 *id.* 506. Thus the act passed in
1817, authorizing banks to take an interest of *seven* per cent-
um per annum on loans, *Laws of* 1817, *p.* 306, was repealed
in 1818, *Laws of* 1818, *p.* 243 ; and by the last statute, in-
corporated banks refusing to pay their bills and notes were
subjected to the payment of interest at the rate of *ten* per cent.
So also in 1813, banks as well as individuals were restrained
from issuing bills of a denomination less than one dollar. 2
*R. L.* 234. Corporations like individuals are subject to the
control of the legislature ; their rights are not more sacred than
those of individuals. The restraining act does not impair any
powers specially granted to the corporation, nor any neces-
sary to its existence or the accomplishment of the main ob-
ject for which it was created. If the legislature have the pow-
er to restrain ididividuals from banking, they may restrain cor-
porations, unless expressly created for banking purposes.

*By the Court*, SUTHERLAND, J. The replications appear to
me to be bad for some of the causes specially assigned in the
demurrer. 1. The citizens who were willing and desirous to
agree for and take the water, should some or one of them

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

have been named in the replications. The allegation is, that *a great number* of citizens have, at all times since the passing of the act incorporating the defendants, *been willing and desirous* to agree for and take the water, but that the company have not furnished or continued a supply for the *use of all such citizens*, &c. If the allegations were true in point of fact, and could be proved, the attorney general must have known, or have had it in his power to ascertain the names of the individuals who were thus desirous to agree; and it is all important to the defendants that they should be informed who they are, in order that they might come to the trial prepared to controvert or explain the fact. Although the general rule in pleading is, that wherever a subject comprehends multiplicity of matters to avoid prolixity, generality of pleading is allowed, yet it is subject to a qualification equally general, that where there is any thing specific in the subject, though consisting of a number of acts or particulars, they must be particularly enumerated. This is the rule laid down by Buller, J. in *Janson* v. *Stuart*, 1 *T. R.* 753, and he illustrates it by the case of a covenant by A. *to enfeoff of all his lands*, where the covenantor in shewing performance *must state them all.* So, if a person be bound *to pay all the legacies in a will*, he must specify them all and aver payment of each; and the reason is, because all the facts are within the knowledge of the party. *Cro. Eliz.* 749. This doctrine was very fully considered by this court in the case of *Van Ness* v. *Hamilton, and others*, 19 *Johns. R.* 349, and by the court of king's bench, in *Janson* v. *Stuart*, above referred to. *Janson* v. *Stuart* was an action for a libel, in which the plaintiff was charged with being a *notorious swindler.* The defendant pleaded by way of jurisdiction that the plaintiff had been illegally, fraudulently and dishonestly concerned and connected with, and was one of a gang of swindlers and common informers, and also had been guilty of deceiving and defrauding divers persons with whom he had had dealings, &c. To this plea the plaintiff demurred specially, and it was held, bad on account of its want of particularity. *Ashurst*, J. says, the plea is bad on account of its generality. The substance of the libel is, that the plaintiff was a common swindler, and that he, in con-

cert with others, defrauded divers persons. When the defendant took upon himself to justify generally the charge of swindling, he must have been prepared with the facts which constitute the charge, in order to maintain his plea; and he ought to state those facts specifically, to give the plaintiff an opportunity of denying them, for he cannot come to trial prepared to justify his whole life. If the defendant can support his charge that the plaintiff had defrauded divers persons, it must be known to him whom he has defrauded, and he must call them as witnesses to prove the particular acts of fraud. If he cannot substantiate his charge, he ought not to have made it. *Buller*, J. is equally explicit. He says, the question is whether the defendant is at liberty to charge the plaintiff with *swindling*, without shewing any instances of it. It is contrary, he observes, to every rule of pleading; for, wherever one person charges another with fraud, he must know the particular instances on which his charge is founded, and therefore ought to disclose them, and then lays down the general rule of pleading, where the subject comprehends multiplicity of matters, as it has already been stated. *Van Ness* v. *Hamilton and others*, was also the case of a libel, in which the defendants' pleas of justification were held bad on special demurrer for want of particularity. It is unnecessary to state the pleadings or the opinion of the court in that case. Judge Spencer, who delivered the opinion, expresses his unqualified approbation of the case of *Janson* v. *Stuart*. He states the opinions of Judges Buller and Ashurst at length, and says that he has found no case impugning the principles there laid down. This is a case of a penal character, in which a forfeiture of most valuable and important franchises is sought to be established, and in which at least as great certainty and strictness in pleading will be required as in a civil action for a libel. *Comyn's Dig. tit. Pleadings*, C. 76. 1 *Ld. Raym.* 107, 478. 1 *Salk.* 139. *Vent.* 78. 2 *Mass. R.* 444. 4 *id.* 471. But this is not a case, I apprehend, to which the principle that a short mode of pleading will be tolerated where particulars will tend to prolixity, is at all applicable. For the culpable neglect or omission of the defendants to supply a *single individual* with water, would effectually produce a for-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

feiture as the omission to supply a hundred. But the second replication is supposed by the attorney general to stand on a better footing in this respect than the first. It is said that they have never furnished *any quantity whatever* of pure and wholesome water, and that the demurrer admits it. It is answered, and I think correctly, that this is not its just construction. It alleges that the defendants have not furnished a supply, *or any quantity* of water for the use of *all who were desirous to take it.* If there is a single individual who was desirous to take the water and has not been supplied, it satisfies the averment. It may therefore be said in judgment of law to admit a supply to most of the citizens who wished it, and is liable to all the objections which have been stated to the first replication on the ground of its generality.

I think the plaintiffs were bound to aver a *request*, on the part of those citizens who wished a supply of water, to the defendants to furnish it, or an *offer* on their part to pay for it, or that the defendants had *notice* of their alleged willingness or desire to agree for it. It was said in argument, that request or notice on the part of those who wished to be supplied was no part of the condition, and that it was not therefore necessary to be averred in stating the breach. The condition or proviso was, that the defendants should furnish a supply of pure and wholesome water, sufficient for the use of all such citizens *as should agree to take it* on the terms to be demanded by the said corporation. It was to be furnished to such citizens only *as should agree to take it.* Notice and request are both substantially and necessarily involved in the very act of agreeing or making a contract for a supply of the water. The citizens were to seek the corporation, not the corporation the citizens, for the purpose of agreeing. It appears, to me, therefore, that notice or request from those who wished to be supplied, is of the very essence of the condition. How could the defendants supply water to those of whose wish to take it they were ignorant. Great strictness is required in assigning a breach of a condition, for the purpose of producing a forfeiture. The general rule is, that the breach in such cases must be in the very words of the condition. Admitting, however, that that is not in all cases indispensable, it must at least be according

to its full legal effect and spirit. I think it is defective in this case in the particulars which have been adverted to.

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

Neither replication contains an allegation of a material fact, on which issue could be taken, and are both bad on that account. They allege that the defendants have not furnished a supply of water sufficient for the use of all such citizens as were *willing and desious to agree for and take the same.* The issue, if one had been taken, would have been upon *the willingness or desire of the citizens* to agree to take the water. This would have been an issue upon an emotion or affection of the mind, which is not traversable or susceptible of trial. *Comyn's Dig. tit. Pleader, G. 7. Laws on Plead.* 207. In *Van Ness* v. *Hamilton,* 19 *Johns. R.* 372, already referred to, this point is expressly adjudged. The 7th plea in that case alleged that the plaintiff exerted the influence of his talents and station to procure the passage of the act incorporating the *Bank of America,* under and with the hope and expectation of being compensated and rewarded for his services, &c. Judge Spencer says this allegation is bad, because it is impossible to take issue on the fact, for it is not susceptible of trial. The plea states no fact on which that hope or expectation could be founded; and, instead therefore of a trial of fact, the inquiry would be into the *secret operations of the mind and thoughts* of the plaintiff; and he adds that such a plea is without a precedent. So in the case at bar, no fact or act is alleged from which the willingness or desire of any citizen to take the water could be inferred. It is a naked allegation of an abstract uncommunicated desire. In these respects the replications appear to me to be defective, and the demurrer to be well taken.

The statute in relation to double pleading, &c. does not apply to criminal cases; it is an enabling statute, and does not take away a previous right which always existed in such cases. 2 *R. S.* 356, § 27. 6 *Cowen,* 196, 217. This is in the nature of a criminal case, and the attorney general had a right to set up several distinct causes of forfeiture in distinct pleas or replications; but if he had not, the remedy is not by demurrer, but by motion to the court to strike out one of the pleas. This cause of demurrer is therefore unfounded.

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

Having thus disposed of the special grounds of demurrer to the plaintiffs' replication, we will proceed to the consideration of the defendants' plea, upon which the main questions in the cause arise. It is contended on behalf of the plaintiffs that this plea is bad in substance ; that it shows no subsisting right or title in the defendants to be a *corporation;* or if they are a corporation, that they have *banking powers.* 1. Are the defendants shown by the plea to be a subsisting corporation? It is said on behalf of the people that the plea is defective in this respect, because it does not set forth the proviso contained in the 7th section of the original act of incorporation, and aver a performance of the condition. That proviso is as follows : " *Provided,* that said company shall, within ten years from the passing of this act, furnish and continue a supply of pure and wholesome water, sufficient for the use of all such citizens dwelling in said city, as shall agree to take it on the terms to be demanded by the said company ; in default whereof, the said corporation shall be dissolved." By the act of the 25th March, 1808, the time for fulfilling this condition was extended for *ten* years. To this it is answered, 1. That it was only necessary for the defendants to set forth enough, *prima facie,* to show title, and if any thing existed to defeat it, it was for the plaintiffs to show it. Such undoubtedly is the general rule of pleading. Mr. Chitty, 1 *Chitty's Pl.* 301, 2, says, that in declaring on a contract, any *proviso* or *condition* which goes merely in *defeasance* of it need not be stated, for this ought to come from the other side ; but if such proviso or condition constitute a *condition precedent,* then it must be stated by the plaintiff. Saunders, 1 *Saund.* 234, *n.* 2, lays down the rule in the same manner. He says, the plaintiff need not declare upon any more of the deed than the covenant, although there be a *proviso* or *condition,* which goes in *defeasance* of the covenant, for this ought to come from the other side, 1 *Leo,* 88 ; and *Ashurst,* J. in *Hotham* v. *The East India Company,* 1 *T. R.* 645, states the rule in nearly the same language used by Mr. Chitty. Vide also 2 *Saund.* 62, *b, note* 5. The rule is equally applicable to a right or title set up by *way of plea,* as to a right asserted in a declaration. It is a general rule of pleading, founded in reason and con-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

venience, and applies to the course of proceeding in a case like that now before the court, as well as to a suit for the enforcement of a mere contract. I believe it was not contended, and it certainly cannot be successfully, that a compliance with the *proviso* in this case was a *condition precedent* to the original rightful existence and organization of the defendants as a corporation. The first enacting clause of the act creates and declares the individuals therein named, and their associates, a body politic and corporate in *presenti*, while, by the very terms of the proviso, they were to have ten years thereafter to furnish the water. Neither their existence nor their general powers as a corporation were in abeyance during that period. They had a right immediately to exercise any of the powers conferred upon them by their charter. The proviso was strictly a *defeasance*, and not a *condition precedent;* and it was not necessary, therefore, for the defendants to notice it in their plea. Perhaps the counsel meant to contend, that as the defendants were called upon by the information to shew by what authority they *now* claim and exercise the franchise of being a corporation, they were bound to aver every thing necessary to shew *a present right;* and as the period limited by the proviso had long before elapsed, it was incumbent upon them, among other things, to shew that they had performed that condition. It seems to me to be a satifactory answer to this argument to say, that the corporation having been shewn to have been legally created and organized, is in judgment of law supposed to continue to exist until the contrary is shewn, and to have performed all its duties, and among others, the duty of supplying the city of New-York with pure and wholesome water.

But, independently of the considerations which have already been stated in answer to the objection, founded upon the alleged forfeiture for a failure to perform the condition of the proviso, the defendants contend, that conceding that they had subjected themselves to a forfeiture on that ground, the plea shows a valid dispensation and waiver by the legislature of such forfeiture, in the various acts which they have since passed, recognizing the continued existence of the corporation. By the original act of 1799, the proviso was to be complied

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

within ten years; in 1808, the time was extended for ten years more, which of course expired in 1818. If not complied with then, it could not be at all. The forfeiture, or the right of the state to enforce the forfeiture, was then complete, and the argument is, that as they have since, in repeated instances in solemn and formal acts of the legislature, recognized the defendants as an existing corporation, they are now estopped from setting up the forfeiture. The doctrine upon which this argument is founded is a familiar one in the law. It is most frequently applied in cases between landlord and tenant, where the lessor seeks to enforce a forfeiture for a condition broken. Lord Coke, 1 *Inst.* 211, *b*, § 341, thus states the doctrine: "If the condition be broken for non-payment of the rent, yet if the lessor bringeth an assize for the rent due at that time, he shall never enter for the condition broken, because he affirmeth the rent to have continuance, and thereby waiveth the condition; and so if the feoffor had distrained for the rent, for non-payment whereof the condition was broken, he shall never enter for the condition broken; *and if he accept* a rent due at a day *after*, he shall not enter for the condition broken, because he thereby affirmeth the lease to have a continuance." In *Woodfall's Land. and Ten.* 203, it is said the law will always lean against forfeitures, and as courts adhere strictly to the precise words of the condition, in order to prevent a forfeiture, so, where a forfeiture has manifestly been committed, they will not allow the lessor to take advantage of it, if they find he has afterwards done any act that amounts to a waiver of it, as by acceptance of rent due after the forfeiture incurred, or action brought to recover the same; but the forfeiture must be known to the lessor at the time, in order to render his acceptance of rent, or any other act, a waiver. The books are full of cases in which this principle has been recognized and applied. *Jackson, ex dem. Norton,* v. *Sheldon,* 5 *Cowen,* 448. 1 *H. Black.* 311. 6 *T. R.* 220. *Adams on Ej.* 160. 1 *Saund.* 287, *n.* 16. 1 *Ball & Beat.* 554. 3 *T. R.* 151. 3 *Coke, Pennant's case, p.* 64. *Cro. Car.* 234. *Goodright* v. *Davis, Cowp.* 803. In this last case, Lord Mansfield applied the rule, and observed, that forfeitures are not favored in law; and where the forfeiture is once waived, the court will

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

not assist it. It is proper to observe, however, that the rule does not apply to those cases in which, by the terms of the contract, the estate, upon the failure of the tenant to perform the condition, *absolutely determines*, for where the estate is *ipso facto* void by the condition, no acceptance of rent afterwards can give it continuance; otherwise, of an estate or lease *voidable* by entry. *Coke Litt.* 215, *a.* *Woodfall*, 204. 3 *Coke*, 64. It will be remarked that this doctrine does not stand upon any advantage accrued to the lessor, or injury sustained by the lessee, from the act which is held to be a waiver. It is a technical doctrine introduced and applied by courts for the purpose of defeating forfeitures. They will not therefore permit a lessor or landlord to say that his lessee has forfeited his estate, when his own acts show that since such forfeiture he has admitted the continuance of his estate, or the relation of landlord and tenant still to subsist. The rule and principle upon which it is founded appear to me to be entirely applicable to the case at bar.

As to the fact that various acts of the legislature passed since 1818 (as set out in the plea) do recognize the subsequent and continued existence of the defendants as a corporation, there can be no dispute. Thus the act of the 21st of April, 1818, directing a portion of the public funds to be deposited with the defendants, upon the condition of their making a loan to the state of $1,000,000, and the acts of March 27th, 1821, and of December 3d, 1827, in which such deposits are spoken of and recognized, and directed to be continued by the comptroller, if the said bank shall pay a rate of interest for such deposits equal to that paid by the banks in Albany upon the state deposits. The state would hardly direct its funds to be deposited with a dissolved corporation, or enter into a *contract* with it for the payment of interest. A stronger or more direct recognition of it as an existing corporation could scarcely have been made.

The only remaining questions upon this branch of the case, then, are, 1. Whether the state is to be deemed to have had notice of the failure of the corporation to fulfil the condition of the proviso when these acts of recognition or waiver took place; and 2. Whether, by a failure to perform the condition,

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

the corporation was *ipso facto* absolutely dissolved, so as to render the doctrine of waiver inapplicable to the case. It will be recollected that by the act of the 25th March, 1808, the stock of the company was increased, and the state reserved to itself the right to subscribe 1000 shares in such stock; and the plea avers that on the 25th April, 1809, the state did subscribe to and become proprietor of 1000 shares of said stock, and has hitherto continued to hold the same, and to receive semi-annual dividends thereon, and to vote in the annual choice and election of directors of the company. Since 1809, therefore, the state has been one of the corporators, participating in the direction and control of the company, sharing its profits, and to the extent of its interest, subject to equal responsibility with the rest of the stockholders. It cannot, I think, under such circumstances, be permitted to set up its ignorance of the existence of a cause of forfeiture, if any in fact existed, in order to defeat the legal effect of its own subsequent acts.

2. The failure of the defendants (admitting them to have failed) to perform the condition of the proviso did not *ipso facto* produce a dissolution of the corporation, or an absolute and instantaneous destruction of its corporate existence. The act declares that in default of fulfilling the condition, the said corporation shall be dissolved; that is, in the regular, legal manner; upon the institution and prosecution of the established course of proceedings in such cases, it shall be cause of forfeiture or dissolution. It would not, I apprehend, be competent for a debtor of the company, when sued, to set up by way of defence that the corporation was dissolved, unless such dissolution had been established by the judgment of this court. *Bank of Niagara* v. *Johnson*, 8 *Wendell*, 645. That is a matter to be judicially tried and determined, and not to be inquired into collaterally. Where the corporation expires by lapse of time, it may be otherwise, and in such case only. The right of the defendants, therefore, to exercise the liberty, privilege and franchise of being a *body politic and corporate* is sufficiently established by the plea.

We proceed, then, in the last place, to consider whether, admitting them to be a corporation, they are shown to possess banking powers. The right to bank is claimed, 1. Under

the original act of incorporation of the 2d April, 1799 ; 2. Under the act supplementary thereto, passed the 25th March, 1808 ; and 3. Under the various acts of the legislature subsequently passed, as set forth in the plea, recognizing the defendants as a *banking corporation*. By the 8th section of the original act of incorporation, 2 *R. L. of* 1801, *p.* 374, it is provided that it shall be lawful for said company to employ all *such surplus capital* as may belong or accrue to said company in the purchase of public or other stock *or in any other monied transaction or operation*, not inconsistent with the constitution and laws of this state, or of the United States, for the sole benefit of the said company. This was before the restraining act, (which was not passed until 1804,) and when there was no other law, either of this state or of the United States, rendering banking, either by individuals or corporations, illegal. That the business of banking, both in the strict and popular signification of the term, and whether considered in the aggregate or in the detail is a monied transaction or operation, is too clear to admit of discussion. 9 *Mass. R.* 54. 15 *Johns. R.* 390. 2 *Cowen,* 710. The terms here employed by the legislature are broad and comprehensive ; and if the power of banking can be conferred in general terms, without using the word itself or enumerating the particulars in which it consists, they would seem necessarily to embrace it, unless they are qualified and restrained by other parts of the charter, which will be hereafter considered. The right to carry on banking operations was certainly less clearly conferred by the act incorporating the Utica Insurance Company than by this act ; and yet Ch. J. Thompson held, 15 *Johns. R.* 381, that, independently of the restraining act, that charter contained all the power necessary to carry on banking business ; but he, with a majority of the court, held that the restraining act did apply to the case, and that on that ground the company had no right to bank. Judge Spencer thought the restraining act did not apply, and that the power of banking was clearly conferred by the terms of the charter. Banking powers have been defined by this court to consist in the right of issuing negotiable notes, discounting notes, and receiving deposits. 15 *Johns. R.* 390, *per Spencer, J.* 2 *Cowen,* 710, *per Savage, Ch. J.* In

ALBANY, Oct. 1832.

The People
v.
President, &c. of the Manhattan Co.

ALBANY,
Oct. 1832.

The People
v.
President &c.
of the Man-
hattan Co.

the case last referred to, it is also correctly said, that previous to the restraing acts, there was no power possessed by a bank not also allowed to individuals and private associations. They could in common issue notes, discount notes, and receive deposits. The only difference was, that the former were not liable beyond their corporate property, while the latter were accountable in their persons and to the full extent of their private estates. Corporations, however, differ from individuals and private associations in this: that while the latter may do every thing which they are not prohibited from doing by the general law, the former can do nothing except what they are authorized to do by their charters. Ch. J. Thompson, in *The People* v. *The Utica Ins. Co.*, 15 *Johns. R.* 382, says, "Incorporated companies have no rights except such as are specially granted, and those that are necessary to carry into effect the powers so granted. Many powers and capacities are tacitly annexed to a corporation duly created, but they are such only as are necessary to carry into effect the purposes for which it was established. The specification of certain powers operates as a restraint to such objects only, and is an implied prohibition of the exercise of other and distinct powers." In *The New-York Firemen Ins. Co.* v. *Ely*, 2 *Cowen*, 709, Ch. J. Savage says, " A corporation is merely a political institution; it can have no other capacities than such as are necessary to carry into effect the purposes for which it was established. It is a creature of the legislature, and can have no powers but such as are given to it by its creator, either at the time of its creation or subsequently, or such powers as are incidental to those granted." 1 *Kyd on Corp.* 13, 70. *Broughton* v. *Manchester Water Works*, 3 *Barn. & Ald.* 9, 12. This is now the well established doctrine, both in this court and in England.

The rules to be applied in the construction of statutes are well summed up by Judge Thompson in *The People* v. *The Utica Ins. Co.*, 15 *Johns. R.* 380. Such construction ought to be put upon a statute as will best answer the intention which the makers had in view; and this intention is sometimes to be collected from the cause or necessity of making the statute, and sometimes from other circumstances; and whenever

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

such intention can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute. Where the words are obscure or doubtful, the intention of the legislature is to be resorted to in order to find the meaning of the words. A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers; and such construction ought to be put upon a statute as will suffer it to be eluded. *Bac. Abr. Stat.* 1, 5, 10, *and authorities there cited.* The predominant intention of the legislature in incorporating the Manhattan Company was undoubtedly to procure for the city of New-York a supply of pure and wholesome water. The act is accordingly entitled, " An act for supplying the city of New-York with pure and wholesome water," and eight out of the ten sections of which it is composed contain provisions directed exclusively to the accomplishment of that object. That object being, as the legislature supposed, secured, they then proceed in the 8th section to give the company authority to dispose of what might remain of their capital, or be subsequently added to it by the profits of their main business. They may employ such surplus capital as may belong or accrue to them, in the purchase of public or other stock, or in any other monied transactions or operations not inconsistent with the constitution and laws of this state, or of the United States. No argument against the banking powers of this company can therefore be drawn from the fact that the creation of a bank was not the main purpose of the act of incorporation. That is conceded; but the question which we are now considering is whether, admitting the main object to have been accomplished, the defendants had not a right to employ what was left of their capital in banking operations; and in this point of view the 8th section is to be construed in the same manner as though it formed a separate and distinct act by itself. But I deem it unnecessary to enlarge upon this branch of the case. The discounting of notes is certainly most emphatically a

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

monied operation ; and if any doubt existed as to the power
of the corporation to make negotiable paper, it was remov-
ed by the 6th section of the act of 1808, 5 *Laws of N. Y.*
295, *Web. & Sk. ed.* in which it is expressly given ; and al-
though the act of receiving deposits may not, *per se,* sepa-
rate and distinct from the other acts, be so clearly a monied
transaction, it may very properly be considered as em-
braced with them under that general term.

It was said by the counsel for the plaintiffs that the addi-
tional power conferred upon the company by the 6th section
of the act of 1808, was conditional, not absolute ; depending
upon the circumstance of their selling and transferring to the
corporation of New-York the right and duty of supplying the
city with water. It is true that it was the principal object
of that act to authorize such transfer, and that many of its
provisions had an exclusive reference to it. But several of
the sections were entirely unconditional, extending the right,
and imposing additional obligations upon the company.
Thus the 8th section extended the time for fulfilling the con-
dition of the proviso in the original act, for ten years. The
10th section increased the capital stock of the company
1000 shares, and gave the state a right to become a stock-
holder in the company to that amount. It is not denied
that these sections were absolute and unqualified ; although
the sale to the corporation of New-York never took place,
the state immediately subscribed 1000 shares in the stock
of the company, and from that time to the present has con-
tinued to hold it, and the pleadings in this case admit that
the defendants had until 1818 to comply with the proviso
of the original act. There is nothing conditional in the
terms of the 6th section. It delares that the bills obliga-
tory and of credit, under the seal of the said corporation,
and all bills or notes which may be issued by order of said
company, &c. shall be assignable and negotiable, &c. ;
not in the event of the arrangement between the company
and the corporation being consummated, but absolutely and
unconditionally. The suggestion that this provision was
intended to apply simply to the bonds and notes which
the company might have occasion to issue in the course of
its transactions as a water company, appears to me entirely

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

unfounded. By the original act the duration of the corpora-
tion was unlimited. By the 9th section of the act of 1808,
it was provided, that in case the sale authorized by the act
was made, the duration of the Manhattan Company should
be limited to 30 years from and after the completion of such
sale. If it had no powers, either under the original or sup-
plementary act, except as a water company, why prolong
its existence for 30 years? In the event of its transferring
all the rights and duties which belonged to it in that charac-
ter, why add 1000 shares to its stock, and authorize the state
to become a stockholder to that amount? Why provide, as
is done by the 5th section, that if the said sale and transfer
were completed, it should be lawful for the company to em-
ploy *the whole* of its capital in like manner *as they were au-
thorized by the original act to employ their surplus capital?*
The whole act clearly demonstrates the perfect understand-
ing of the legislature, that the defendants, after they should
have transferred to the corporation of New-York the right
to supply the city with water, were still to remain an effi-
cient corporation, with a capital of more than two millions
of dollars, and engaged in operations of so profitable a char-
acter that it was desirable for the state to become interested
in its stock; and that those operations were to be carried on
under the power conferred by the original charter to employ
their surplus capital in any monied operations not prohibit-
ed by law. The inference from this act is irresistible to my
mind, that it was perfectly understood by the legislature that
the defendants were then employing such portion of their
capital as was not invested in their water works *in banking
operations*, and that no doubt was entertained of their right
so to employ it; and so far from manifesting any disappro-
bation of such proceeding, one of the principal effects of the
act was to authorize and enable them to employ the *whole*,
instead of *a portion* of their capital in that manner.

The subsequent acts of the legislature, set forth in the plea,
repeatedly speak of this company *as a bank*, and direct the of-
ficers of the government to open and keep accounts with it as
such, and to deposit a portion of the public money in its vaults;
and every legislature since must have known that the funds

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

of the state were thus deposited. Admitting the right of the defendants to bank under their original charter to be doubtful, these acts being in *pari materia*, relating to the same subject matter, may be considered as a *legislative construction* of the original act, and as removing all doubt of the right of the defendants to employ their *surplus capital in banking*. I deem it unnecessary, therefore, to discuss the question whether these various acts of the legislature, in which they speak of and recognize the defendants as a *banking corporation*, would *of themselves have conferred banking powers*, admitting them not to have been conferred by the original act of incorporation and the act of 1808.

But it is contended, that admitting the defendants to have the right, under any or all of the acts which have been referred to, to employ their *surplus* capital in banking, the plea in this case is bad, 1. Because the claim is not confined to the *surplus*, but extends to the employment of the whole capital of the company in that manner ; and 2. Because it does not show that the defendants have any surplus capital after accomplishing the main object for which the corporation was created, and that the plea neither shows that that object was accomplished, nor that any attempt was ever made to carry it into effect. I think the true construction of the plea, when taken as a whole, is a claim to use *only the surplus capital* of the company in banking operations. After setting out the original act of incorporation, and the various acts subsequently passed, the plea concludes thus : *wherefore*, the said president, &c. say that from the time of the passing of the said first mentioned act, hitherto they have been a body politic and corporate, and are and claim to be entitled to do all lawful acts, &c. and to use the privilege and franchise of being a body politic, &c, " and to employ *the surplus capital* belonging to said company in the purchase of public or other stock, or in any other monied transactions, &c. and to employ *a part of the effects* of the said company, and be interested in a fund employed for the purpose of receiving deposits, issuing notes and making discounts, &c. by employing therein *the surplus capital* belonging or accruing to said company ; and also the liberty and franchise of keeping an office for the purpose of receiving deposits,

discounting bills, and issuing bills, promissory notes, &c. for the purpose of loaning them and putting them in circulation as money, and of receiving deposits and carrying on banking operations, such as are usually carried on by incorporated banks. It is evident, I think, that the pleader intended to claim only the right of using the *surplus capital* of the company in the various operations here specified, and that such, at all events, must be the construction upon general demurrer. To the objection that the plea does not show that the defendants have or ever had *any surplus capital*, after accomplishing the main object of the creation of the corporation, inasmuch as it does not aver or show in any manner that such object ever was accomplished, it is answered, 1. That the corporation had a right immediately to call in the whole capital of $2,000,000, and to employ in monied operations such portions of it as were not immediately required in their preparation and arrangements for bringing the water; and that the portion thus employed, would be *surplus capital* within the meaning of the act; that they could therefore have *surplus capital* before the main object of their incorporation was accomplished, and such accomplishment therefore need not be averred; and 2. It is said that this being a public act, (of the contents and construction of which the court are bound to take notice,) if *surplus funds* in the act mean capital remaining after the supply of water for the city was completed, then such is its meaning in the plea. But it is farther contended, that if the plea is bad in this respect, it is cured by the replication which directs the issue to a different point. *Comyn's Dig. tit. Pleader, E.* 37, *C.* 85, *and cases there put.* 1 *Chitty's Plead.* 261, 401, *n. k.* 2 *Saund.* 74, *b.* These answers appear to me satisfactory to dispose of the objection. Although it is the paramount duty of the corporation to supply the city of N. York with pure and wholesome water, and if they neglect or fail to do it, (without justifiable cause,) they will forfeit their charter, yet the complete fulfilment of that duty is not, strictly speaking, a condition precedent to the existence of *surplus funds* in their hands, or their right to employ them in monied operations. I see nothing in their charter to prevent their calling in their whole capital whenever the directors may think proper; and it might

ALBANY,
· Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

well be, that but a portion of it could be judicially expended for some time in the preparations for bringing water. What might remain thus unemployed, I am inclined to think, would be *surplus capital,* within the meaning of the act.

The restraining acts do not affect the powers or rights of this corporation. This company, it will be recollected, was incorporated on the 2d day of April, 1799, and the first re-straining act was passed the 11th of April, 1804. 3 *Web. ed. of Laws,* 611.· 2 *R. L. of* 1813, 234, § 2. The Manhattan Company had then been in operation between four and five years; and although the fact may not explicitly appear on the face of this record, it is believed it had from its first or-ganization issued notes and carried on all the ordinary ope-rations of a bank. With the full knowledge of this fact, the legislature, in the restraining act of 1804, used no terms ex-cept such as were clearly prospective and future in their operation. The act provides that after the passing thereof, no person, unauthorized by law, *shall* subscribe to or become a member of any association, institution or company, or pro-prietor of any bank or fund for the purpose of issuing notes, receiving deposits, &c.; and if any person unauthorized by law as aforesaid, shall *hereafter* subscribe or become a mem-ber as aforesaid, he shall forfeit and pay the sum of $1000; and all the acts here prohibited had long anterior to this been performed by the stockholders and proprietors of this company. There was nothing therefore in its terms which interfered with or prohibited the continuance of their ac-customed business; but to guard against possible misappre-hension upon this subject, the legislature at the same ses-sion passed an act expressly declaring "that nothing in the restraining act contained, should be deemed or construed in any manner or way to affect the incorporation in the city of New-York, created by virtue of an act entitled an act for supplying the city of New-York with pure and whole-some water." This provision is to be found in an act in-corporating the Columbian Friendly Union Society in the city and county of Albany, which appears to have passed the 10th of April, 1804, the day before the passing of the restrain-ing act. The latter act, however, must have first pass-ed the two houses of the legislature. They were probably

both sent to the executive at the same time, and the appa-
rent incongruity is undoubtedly owing to his having signed
and returned the former bill one day before the latter. It
was asserted by counsel, and the assertion is believed to be
correct, that this saving clause in the act of 1804 has never
been expressly repealed. The restraining act of 1804 was,
with other provisions in relation to banks, formed into an
act in the revision of the laws of ·1813, 2 *R. L.* 234; and
the repealing act of that session, 2 *R. L.* 556, provides that
all acts and parts of acts theretofore passed, which came
within the purview or operation of any of the acts passed
during the (then) present session of the legislature, com-
monly called the revised acts, shall be repealed, &c. saving
all rights, &c.; and whether the saving clause, before re-
ferred to, would or would not, upon the established princi-
ples applicable to the construction of statutes, be considered
as falling within the purview of the restraining act of 1813,
and therefore repealed, it is deemed unnecessary to con-
sider; as whatever might be the conclusion upon that point,
it is not perceived that it would vary or affect the rights of
the defendants. The restraining act of 1818, *Laws of
1818, p.* 242, 3, was more comprehensive in its terms than
the act of 1804. It declared it to be unlawful for any per-
son, association of persons, or body corporate, from and af-
ter the first day of August (then) next, to keep an office of
deposit for the purpose of discounting promissory notes, or
for carrying on any kind of banking business or operations
which incorporated banks are authorized by law to carry
on, or issue any bills or promissory notes as private bankers,
*unless thereunto specially authorized by law;* but it contain-
ed a proviso, that nothing in said act should be deemed or
construed to abridge, enlarge or in any way affect any rights
theretofore granted by law to any incorporated company.
If the charter of the defendants gave them the right to car-
ry on banking operations, (as I have endeavored to show it
did, in a previous part of this opinion,) then whatever might
be the construction of the enacting clause of this act, that
right is expressly saved by the proviso.

Without bestowing, therefore, any further attention upon
the act of 1804 or the act of 1818, I pass to the consideration

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

of the act of 1827, 1 *R. S.* 712. This act brings together and consolidates all the previous statutory provisions in relation to banks, and adds to them several new ones.

The first section embraces substantially the restraining act of 1804, and the sixth section the restraining act of 1818, with the exception of the proviso. It is as follows: "No person, association of persons or body corporate, *except such bodies corporate as are expressly authorized by law,* shall keep any office for the purpose of receiving deposits, or discounting notes or bills," &c. &c. ; and that title of the revised statutes which defines and regulates the general powers, privileges and liabilities of corporations, 1 *R. S.* 600, contains the following general provision: " No corporation created or to be created, and *not expressly incorporated for banking purposes,* shall by any implication or construction be deemed to possess the power of discounting bills, notes or other evidences of debt, of receiving deposits, or buying gold and silver, bullion or foreign coins, of buying and selling bills of exchange, or of issuing bills, notes or other evidences of debt upon loan, or for circulation as money." I am persuaded these provisions were never intended to apply to pre-existing corporations, not affected by the previous restraining acts. There is an ample field for their operation without giving them such a construction. I have no doubt that the proviso in the restraining act of 1818, saving the rights of existing corporations, was omitted by the revisors and the legislature in the act of 1827, simply because it was deemed entirely useless, and upon the principle which was generally pursued in that revision of the laws, of adopting the clearest and most perspicuous language, and omitting all words and expressions which had no effect upon the legal operation and construction of the acts. Nothing has been considered better settled than that the rights and privileges conferred by these acts of incorporation or charters, were held by the sacred obligation of a contract between the public and those on whom they were conferred ; and that any attempt on the part of the legislature to repeal, or to alter or modify any of their essential provisions, would be unconstitutional, as interfering with vested rights, and violating the obligation of a contract. I am not aware that there has ever been any dif-

ALBANY,
Oct. 1832.

The People
v.
President, &c.
of the Man-
hattan Co.

ference of opinion upon this subject among enlightened men, whether lawyers or not. The doctrine has been sanctioned again and again in the supreme court of the United States, and in most of the state courts of the union. It seemed to be supposed by one of the counsel for the people that this doctrine was applicable only to those powers which were expressly conferred by a charter, (in relation to which he freely admitted it,) but that it was not true in relation to implied powers, which were not necessary to the existence of the corporation. It may be, and undoubtedly frequently is difficult precisely and satisfactorily to determine the nature and extent of the powers, intended to be conferred by the general and comprehensive terms, sometimes employed in a charter after the enumeration of specific powers; but when that difficulty is surmounted, and those powers are ascertained by the application of those legal rules, which regulate and control the construction of such instruments, it strikes me as a legal anomaly to contend that they are held by a different and less sacred tenure, than those powers which are expressly given. Corporations are the creatures of the legislature. It gives or withholds such powers as it pleases; but whatever it gives, either expressly or according to the legal construction of the terms employed by it, it has not the constitutional right to withdraw or essentially to modify or impair, although it may, to a certain extent, undoubtedly regulate the manner, in which such powers are to be exercised. To what extent such control may be exerted either by the general law or by special legislative provision, without the violation of the rights of a corporation, it is unnecessary now to consider. · The absolute prohibition of the exercise of so important a power as that of carrying on banking operations, is certainly not a legitimate regulation of the exercise of such power. The legislature, fully aware of these principles, have, in most of the charters which have recently been granted, expressly reserved the power to alter, modify or repeal them. Their right to control such corporations in any manner that they may deem expedient, cannot be questioned. The provisions of the R. S. which we have been considering, may undoubtedly

properly operate upon such corporations, and render it unlawful for them to carry on banking operations, unless their charters give them such powers in express terms. That those provisions, so far as they are retrospective, were designed principally to apply to such cases, I entertain no doubt. There may also be other cases in which no legal objection to their application would exist.