White, J.
The information in this case was filed by the attorney-general, on complaint of Daniel McLaren and others, and charges that the defendants have intruded into and usurped the ofiice of directors of the Dayton and Union Railroad Company, and calls upon them to show by what •warrant they assume to act as such directors. The information also charges that Daniel McLaren and the others named therein are entitled to the ofiice, and asks their induction.
The Dayton and Union Railroad Company is a corporation formed by the creditors and stockholders of the Green-ville and Miami Railroad Company, under articles of agreement entered into in pursuance of the act of April 11, 1861, regulating the sale of railroads, and the reorganization of railroad companies. S. & S. 127.
Both parties claim under that act, and no'question is made as Jo the validity of any of its provisions.
The number of directors in the reorganized company is nine. Seven of the defendants were elected directors at the annual election in January, 1871, and having qualified under that election, were directors at the time of the an *360 nual election in January, 1872. The other defendants, Howard and Pennington, were not directors prior to the election in January, 1872, and they claim solely by virtue of that election.
The defendants pleaded, several pleas. McDaniel and his six co-defendants, who were directors in 1871, in their first plea, set up their election in 1871 as the source of their title, aver that neither the claimants in the information mentioned, nor any other person or persons, have been elected as their successors, and claim to hold over until their successors are elected and qualified. In their second plea they set up that they were duly elected at the annual election in January, 1872, and that having duly qualified, they hold by virtue of that election.
The first plea of Howard and Pennington is substantially the same as the second plea of the other defendants.
In their second plea, Howard and Pennington join with three of the other defendants, who were directors in 1871, viz : Henry C. Stimson, William Harrow, and David Studabaker, and, in addition to setting up the matter stated in their first plea, they further plead, that pending this proceeding, and since process was served on them, they have severally resigned; and that the vacancies caused by their resignations have been filled by the appointment of certain persons named, who have duly qualified and entered upon the discharge of the duties of the office.
Numerous questions have been raised in the case. We shall only notice, in this opinion, such of them as we deem material to its determination.
1. During the progress of the case, objection was made, on behalf of the relator, that the defendants could not plead double; also, that the plea setting up title to hold over, under the election of 1871, and the plea of title under the election of 1872, created such repugnancy that both pleas ought not to be allowed to stand.
Both objections, in our opinion, were properly overruled.
The code rules of pleading do not apply to proceedings in the nature of quo warranto. Pleading in such cases is *361 governed by the rules in force at the time of the adoption of the code. At common law, unaided by statute, double pleading was not allowable; and as the proceeding by information, in the nature of quo warranto, was regarded in England as a criminal prosecution, as well to punish the usurper by fine for the usurpation of the franchise, as to oust him or seize it for the crown, such proceeding was held not to be embraced in the statute of 4 Ann, ch, 16, s. 4, allowing defendants to plead more than one plea. Cole on Criminal Informations, 112, 113, 129; Rex v. Newland, Sayres, 96; Rex v. Leigh, 4 Burr. 2146.
In New York the same view has been taken as to the nature of the proceeding. The People v. President, etc., of Manhattan Co., 9 Wend. 377, and note to People v. Richardson, 4 Cow. 113; The People v. Jones, 18 Wend. 604.
But in this state the proceeding has been divested of its criminal character, and is treated by the statute merely in the nature of a civil proceeding. No punishment is authorized to be inflicted by fine or otherwise, except where the party is adjudged guilty of contempt in disobeying the order of the court.
Section 63 of the practice act of 1831 contains substantially the same provision in regard to double pleading, aa the statute of 4 Ann. Swan’s Stat. (ed. 1841) 661; Stephen on Plead. 262.
In that section it was provided that the defendant in any action might “ plead in any court of record, with leave of such court, as many several matters as he shall think necessary for his defense.” In practice, the defendants in quo warranto informations have been allowed to avail themselves of the benefit of this statute, and we see no good reason why we should now narrow the construction which has thus been practically adopted. The State ex rel. v. The Miami Exporting Co., 11 Ohio, 126; The State ex rel. v. Beecher, 16 Ohio 358; Ohio, ex rel. Attorney-General, v. Cincinnati Gas Light and Coke Co., 18 Ohio St. 262.
Nor is there such repugnancy in the title set up in the *362 first and second pleas, that the defendants should not be allowed to avail themselves of both in the same proceeding. The terms of office are different. If the title pleaded in the second plea should be found good, they would hold for the full term, and until their successors were elected and qualified; but if they should fail on their second plea, and establish the first, their term would only be until the election and qualification of their successors. If there were no persons elected in January, 1872, who were de jure entitled to the office, there was, for the purposes of this suit, in contemplation of law, no election; and the effect of ousting the defendants of both titles would be to leave the corporation without a directory, while judgment in their favor, on their first plea, would only give them the right to retain the office until another election could be held.
2. At the election held in January, 1872, votes were tendered and rejected, on $140,000, in amount, of first mortgage bonds of the Greenville and Miami Railroad Company. No mortgage, known as the first mortgage, was ever issued by the Dayton and Union Railroad Company. The above-named bonds are referred to in the minutes of the latter company as the first mortgage bonds; and the only mortgage which appears to have been issued by that company, is called the second mortgage. One of the principal questions in the case is, whether the owner of the bonds, on which the votes were thus tendered, was entitled to vote on them ; and, if he had such right, whether the votes were tendered by the proper party.
The first section of the act of April 11, 1861, already referred to, provides that in case two-thirds in interest of the creditors, and two-thirds in interest of the stockholders of a railroad company, shall agree, in writing, upon a plan for a readjustment or capitalization of the debt and stock of such company, then, upon a judicial sale of the property and franchises therein mentioned, the same may be purchased, on behalf of the parties to such agreement, by the trustees therein appointed.
*363 Section two provides for a meeting of the parties to the agreement after the sale, and declares that at such meeting-each of the parties to the agreement shall be entitled to vote according to the provisions thereof, but not exceeding one vote for every fifty dollars of the par value of the debt or stock of such party; and that such meeting, by a majority in interest of the persons present, in person or by proxy, shall be competent to retain or change the name of said corporation; to decide, for the time being, the amount of its capital, and the number of shares into which the capital shall bo divided; to fix the number of directors and their term; to elect such directors — a majority of whom shall be residents of the state or states in which such railroad is situated; and to do all things necessary or proper to reorganize said corporation.
Section five, among other things, provides that the reorganized company may, if authorized by the agreement mentioned in section one, confer on holders of any bonds, which it may issue or assume to pay, such right to vote at all meetings of stockholders, not exceeding one vote for every fifty dollars of the par amount of the said bonds, as may have been provided for in the agreement mentioned in section one, which rights, when once fixed, shall attach to and pass with such bonds, under such regulations as the by-laws may prescribe, to the successive holders thereof, but shall not subject any holder to any assessment by said company, or to any liability for its debts, or entitle any holder to dividends.
The fourth, fifth, and eighth articles of the agreement, under which, in the present instance, the reorganization was effected, are as follows:
“IV. The reorganized company shall assume to pay the one hundred and fifty thousand dollars ($150,000) of first mortgage bonds, or so much as there may be outstanding, subject to the lien of which the railroad may be sold, at the time, not less than fifteen years from January first, one thousand eight hundred and sixty-two (1862), to which the payment of the principal of the same may be extended, *364 and shall execute a new mortgage or trust deed upon all its said railroad or other property to secure the payment of the same, with interest at the rate of seven per cent., pay* able semi-annually in the city of New York.
“V. The reorganized company shall also issue bonds, amounting in the aggregate to two hundred and fifty thousand dollars, in all respects, except the date thereof, like those mentioned in the preceding section; but such aggregate may be increased or diminished to an extent not exceeding fifty thousand dollars, by a majority in interest of the holders of bonds being parties hereto, in consideration of the undertaking of Robert Bayard to extend, or procure, or cause to be extended, the time for the payment of the principal of first mortgage bonds as hereinbefore mentioned (a memorandum of such extension to be indorsed on all of said bonds which can be found), the said Bayard shall be entitled to receive second mortgage bonds of the reorganized company in exchange for second and third mortgage bonds, and coupons accrued thereon at par; and the surplus of the said bonds so to be issued shall be distributed pro rata among the holders of the residue of the second and third mortgage bonds of the present company in exchange for an equal amount of said bonds or coupons accrued thereon.
“YHI. Said bonds so issued, or assumed, shall entitle each holder thereof, at all meetings of stockholders, to cast one vote for every fifty dollars of the par value of the bonds by him held; and such right shall pass with such bonds to the transferee, respectively, but shall not subject any holder to any assessment by said company, or to any liability for its debts, or entitle any holder to dividends.”
Bayard, the owner of the bonds in question, was a party to this agreement. After the reorganization, he caused to be indorsed on the bonds, as provided in article five of the agreement, a memorandum of the extension of the time of payment to March 1,1877. He also received from the new company second mortgage bonds in exchange for his second and third mortgage bonds of the old company. The *365 interest on the bonds in question has been regularly paid by the new company, and Bayard had been allowed to vote on them at several previous elections without question.
Several objections are urged, on' behalf of the defendants, to the right of the owner of these bonds to vote on them-It is contended: 1. That they were not assumed by the reorganized company; 2. That to entitle the owner to vote on them required some affirmative action of the latter company, giving the right; and 3. That they were not registered.
A proper construction of the agreement and of the statute, we think, answers the first two objections.
In giving construction to the agreement, it is to be observed that the extension of time on these bonds was vital to the success of the new company, for, without such extension, the object of the reorganization might be defeated by the immediate foreclosure of the mortgage by which they were secured. The agreement preceded the reorganization, and was intended to furnish the fundamental conditions on which it should be effected.
The stipulations as to the extension and assumption of the bonds would be ineffectual unless there should be a reorganization. But the reorganization being effected, Bayard thereby became bound to extend the time on the bonds for at least the period specified, and the new company thereby became liable to pay them when the time expired to which they were extended.
The only affirmative action necessary to bind the new company is found in the fact of the corporators organizing under the agreement, which required the bonds to be assumed and the right to vote to be given. The discretion which would otherwise, under the statute, have remained with the new corporation, was thus taken away by the organic stipulations under which it was created.
In regard to the objection that the bonds were not registered, it is sufficient to say there was no by-law of the company requiring them tojbe registered. The voting register *366 provided for in the second mortgage, had reference only to the second mortgage bonds and the income bonds.
3. At the time the votes on these bonds were rejected, they were tendered under the proxy of Robert Bayard, who still owned them, unless he had been divested of his title by the written agreement of October 25, 1871, between him and Daniel McLaren and others, who are described as representing the Cincinnati, Hamilton and Dayton Railroad Company. The question, therefore, arises, as to the effect of this agreement on the right of property in the bonds. Whether, as respects the transferring of the title, the agreement is an executed or an executory one on the part of Bayard. We think it is executory and conditional. By its terms it is made'subject to the ratification of the board of directors and stockholders of the Cincinnati, Hamilton, and Dayton Railroad Company. No such ratification appears to have been bad. At the time of the tender of the votes on the bonds, no action whatever appears to have been taken by the stockholders in reference to it. And at the annual meeting, in May following, the directors were authorized to act finally upon the subject. Whether any action has been taken by the directors under this authority does not appear.
True, the bonds were delivered by Bayard into the custody of the other contracting parties ; but they held them ’ under the terms of the agi’eement. Nor can the declaration of the parties alter the legal effect of the written agreement. Such declarations can only be regarded as opinions as to their legal rights.
We are unanimous in the opinion that the right to vote • on the bonds was still vested in Bayard.
4. It is further contended that the votes were properly rejected, because Stedman, the attorney in fact, who held the proxy, did not produce the bonds to the judges. It is enough to say to this objection, that the votes were refused on wholly different grounds. The bonds were there, and •could, and doubtless would, have been produced, had their non-production been made a ground of objection. The *367 votes were rejected on two grounds : 1. Because the bonds had not been registered; and 2. Because formal action had not been taken by the directors to authorize the holder to vote on them.
5. It is claimed that if the votes had been received, they would have had no legal effect, because the persons for whom they were proposed to be cast were not stockholders, and were, therefore, disqualified to act as directors.
We deem it unnecessary to consider the point insisted on, that the stock in their names did not constitute them stockholders, for the reason, that to become directors, it was not necessary that they should be stockholders. The statute only required them to be residents of the state. In the absence of a statute requiring it, the discretion of the stockholders in electing directors is not limited to persons holding stock.
It follows, therefore, from what has been said, that the votes in question were improperly rejected, and as, if they had been received, the defendants would not have been elected, the relator is entitled to judgment on the second plea, if the replication to this plea will admit of such judgment.
There is an apparent repugnancy in the averments of this replication. It is averred that on the 23d day of November, 1871, Bayard, for value received, sold, transferred, and delivered all of said $140,000 of bonds to the Cincinnati, Hamilton and Dayton Railroad Company; that at the election in January, 1872, the twenty-eight hundred votes, representing said bonds, were duly tendered for Daniel McLaren and the others named in tbe information, for directors of the Dayton and Hnion Railroad Company, under a due and legal proxy from said Bayard; and that the votes so tendered were refused by the judges.
It is also averred that the votes being rejected when tendered on the proxy, the Cincinnati, Hamilton and Dayton Railroad Company, by its president and board of directors, produced -said bonds and offered to cast said twenty-eight *368 hundred votes for the sanie persons above named, and that the judges refused to receive said votes.
The plea sets up that the bonds were held by the Cincinnati, Hamilton and Dayton Railroad Company, but states they were held illegally. It avers that said company is a corporation chartered to build and operate a railroad from Dayton to Cincinnati; that without any legal right to hold and own said bonds, it got control of the same and placed them in the hands of its directors to enable them to vote at said election, for the purpose of getting control of the said Dayton and Union Railroad, and of owning and running the same in the interest of the Cincinnati, Hamilton and Dayton Railroad Company, and not for any purpose authorized by law, or by any authority of law.
Upon the actual facts of the case, as they appear in evidence, it is not necessary to decide whether the Cincinnati, Hamilton and Dayton Railroad Company had authority to acquire these bonds for the purpose of controlling the Dayton and Union Railroad Company and of using them to effect that object. This question has been elaborately discussed in argument. But, without deciding the question, we are all inclined to the opinion that it had no such power.
It is clear that if Bayard divested himself of all title to the bonds in November, 1871, he had no right to vote upon them at the election in 1872. If the relator withdraws the averments in his replication setting up title in the railroad company, leave to do which will be given, under the circumstances under which the case was submitted, judgment will be rendered on the second plea for the relator.
6. The plea of certain of the defendants, setting up their resignation and the appointment and qualification of their successors, constitutes no answer to the information. If it did, it would be in the power of defendants, in cases of this character, by successive resignations, to render the proceeding wholly ineffectual. Where defendants, pending the quo warranto proceeding, resign, their successors stand, *369 as to the nnexpired term, in their shoes, and will be bound by the judgment. The King v. Warlow, 2 M. & S. 75.
The eases cited, where the term of office has expired pending the proceeding, do not apply to this case.
7. The remaining question is, whether McLaren and others, on whose complaint the information was filed, are entitled to an order of induction under the election of January, 1872.
A minority only of the votes received by the judges were given for them. If we pronounce them elected, it must be on the votes which were refused by the judges when offered, and not upon the votes which were in fact received. We can not, upon a quo warranto information, give the same effect, in declaring who was elected, to votes offered but not received, as is to be given to those that were received by the judges of the election. We can only oust the defendants from the office which they assume to hold, and to which they have not been legally elected, and afford the party whose votes were improperly rejected an opportunity to vote at another election. People v. Phillips, 1 Denio, 389; 13 B. Mon. 520; Angell & Am. on Corp., sec. 138; Renner v. Bennett, 21 Ohio St. 431.
The case, Ex parte Jacob Barker, 6 Wend, 509, referred to by counsel for the relator, as showing a contrary ruling, is founded on a New York statute. This more clearly appears in Ex parte Holmes, 5 Cow. 426. In a subsequent similar proceeding, reported in 19 Wend. 37, the rule was held to be the reverse of what had been declared in 6 Wend, supra.
Judgment will be entered for the defendants holding over as set up in the first plea; and, on the replication being amended as suggested, judgment will be entered for the relator on all the other pleas.