VAN BRUNT, P. J., and PARKER, J., concurred.

Order reversed, with costs and disbursements.

---

In the Matter of the Application of THE NEW YORK AND LONG ISLAND BRIDGE COMPANY, Respondent, against PATRICK SKELLY, Defendant, and LENOX SMITH, Appellant, Relating to Acquiring Title to Certain Real Property.

*New York and Long Island Bridge Co. has a right to condemn lands for bridge purposes — constitutionality of the acts of incorporation, waiver of forfeiture and conferring increased powers — legislative vote required — evidence thereof.*

Upon a trial had in proceedings taken by the New York and Long Island Bridge Company to condemn certain lands for the purpose of constructing a bridge over the East river, it appeared that the company was a corporation created by chapter 395 of the Laws of 1867, as amended by chapter 437 of the Laws of 1871; chapter 426 of the Laws of 1879; chapter 392 of the Laws of 1885; chapter 411 of the Laws of 1892, and chapter 212 of the Laws of 1894.

A proceeding was taken in 1889 to condemn certain lands on Blackwell's Island for the purposes of the company and was dismissed on the ground that the corporation had failed to commence the construction of the bridge and to "contract for the entire structure" within two years from May 30, 1879, as provided for in the act of 1879, and that, because thereof, its charter was forfeited (under the conditions of the act of 1867 which attached themselves to the provisions of the act of 1879) when chapter 392 of the Laws of 1885 was passed; and on the ground that, although the Legislature could waive the forfeiture, it could not, as was attempted to be done in the act of 1885, under the guise of waiving the forfeiture, grant to the corporation the new right of completing the bridge for railway travel, since the right to lay down railway tracks, implied thereby, could not, under the State Constitution, be conferred by a private or local bill.

This being the legal status of the matter, the Legislature passed the act of 1892, which, among other things, provided that the bridge should be " so constructed as to provide for the accommodation and transportation of passengers and vehicles of every description, for the transportation of freight, and for such other purposes, and in such manner as shall in the judgment of the said company seem most desirable." This act also required that the bridge should commence within one mile of the Grand Central Depot in New York city; and it gave the corporation power to build a northern arm " either north or south of the Harlem river, with full authority to the said company to locate and build any other bridges necessary to such approach or approaches." It further required that the bridge construction should be commenced prior to March 3, 1893.

The act of 1894 added a new section to the act of 1892 and declared that nothing in the act of 1894 should be construed as authorizing the laying of railroad tracks in a street.

By a general law (Chap. 225 of the Laws of 1893) the right to lay tracks and to operate a railway was conferred upon any company incorporated for the purpose of constructing a bridge connecting any city of more than 1,000,000 of inhabitants with any other city in this State.

It further appeared, that in 1887 the Congress of the United States passed an act authorizing the construction of the bridge, and that on March 14, 1894, it passed a further act modifying the requirement of the first act relative to the height of the bridge.

The corporation, claiming under these laws the present right to build the bridge and lay down and operate a railway thereon, commenced a proceeding for the purpose of acquiring the title to certain land, in which a referee was appointed who found that the construction of the bridge was commenced in due season, that is to say, prior to March 3, 1893.

*Held*, that under the statutes cited the corporation was still in existence and had a right to condemn lands which were necessary to its purposes. (Per O'BRIEN, J.; VAN BRUNT, P. J., dissenting.)

*Semble*, that the provisions of chapter 411 of the Laws of 1892, so far as it authorized indefinite lateral extensions, including bridges over the Harlem river, were in violation of section 16 of article 3 of the Constitution, as such matters were not embraced within its title; but that the whole act was not rendered void by the existence of these provisions therein. (Per O'BRIEN, J.)

Whether a grant of a right to use the land under water in the East river for a bridge required a two-thirds vote of the Legislature, considered.

Right of the court to consider other evidence than the certificates attached to the original bill, in deciding whether an act received the required vote, considered.

APPEAL by the defendant, Lenox Smith, from a judgment of condemnation and an order appointing commissioners of appraisal, entered in the office of the clerk of the county of New York on the 29th day of April, 1895, upon the decision of the court rendered after a trial at the New York Special Term.

*De Lancey Nicoll* and *Noel Gale*, for the appellant.

*Julien T. Davies* and *Charles F. Stone*, for the respondent.

O'BRIEN, J.:

The order appealed from by the defendant Smith was entered in this condemnation proceeding upon the decision of a referee in favor of the plaintiff petitioner, made upon the interposition of an answer by the defendant Smith, the other defendant, Skelly, having failed to answer.

The premises owned by the appellant, which in this proceeding it is sought to appropriate, are on the easterly side of Third avenue, fifty feet north of Sixty-fourth street. The petition alleges the corporate creation and existence of petitioner, the approval of its plans by the Secretary of War under the act of Congress of March 3, 1887 (24 U. S. Stat. at Large, 468), its object, viz., the construction and maintenance of a bridge over the East river between New York city and Long Island City, the necessity of the acquisition and use of appellant's property for a terminal station of the railroad tracks, and that "the preliminary steps required by law have been taken to entitle it to institute this proceeding." As defenses the answer alleges, *first*, a forfeiture of petitioner's franchises by non-user; *second*, a forfeiture for failure to comply with the provisions of the various acts of the Legislature; *third*, a failure to comply with the act of Congress giving the right to construct the bridge as to the time of commencing work; *fourth*, that the appellant's premises were not necessary for the construction or support of the bridge which the petitioner was authorized to build; and, *fifth*, that the petitioner is building a bridge for railroad traffic without legal authority.

As shown by the petition, the bridge company is a corporation created by and existing under and by virtue of acts of the Legislature of the State of New York, being chapter 395 of the Laws of 1867, and the acts amendatory thereof and supplemental thereto, namely, chapter 437 of the Laws of 1871, chapter 426 of the Laws of 1879, chapter 392 of the Laws of 1885, chapter 411 of the Laws of 1892, and chapter 212 of the Laws of 1894. In 1889 the company instituted condemnation proceedings to take certain lands of the city on Blackwell's Island for its purposes. The city defended, and the proceedings were dismissed at Special Term, on the ground

that the act of 1885 attempted to confer the power to lay down railroad tracks in violation of section 18 of article 3 of the Constitution, and that the grant was, therefore, void. Upon appeal to this court that view was sustained, and the order dismissing the proceedings affirmed. (*Matter of N. Y. & Long Island Bridge Co.*, 54 Hun, 400.) As the status and right of the company at that time to condemn lands were then determined, we may profitably refer to what was therein held, as the necessity is thus avoided of considering the legislation which up to that time had been passed, and we obtain certain rules for our guidance in construing the subsequent legislation of 1892 and 1894.

It was therein held that at the time the act of 1885 was passed the petitioner's charter had been forfeited by its failure to comply with chapter 426 of the Laws of 1879, which provided that the construction of the bridge should be commenced " under contract for the entire structure within two years" from May 30, 1879, before which time nothing was in fact done by the petitioner towards such construction. By the act of 1867 the penalty for a non-compliance therewith was declared to be that " this act and all rights and privileges granted hereby shall be null and void." It was held that the condition contained in the original act of 1867 extended and attached itself to the case of a non-compliance with the act of 1879, enlarging or extending the term of the first-mentioned act; that while the Legislature had power to waive the forfeiture, it had not the power, under the guise of this waiver and under the semblance of reviving the corporate existence, to confer distinctly new rights never before thought of, namely, the right to complete the bridge for railway travel; that the right conferred by the act of 1885 to build the bridge in question for railway travel plainly implied a grant of the right to lay down railway tracks, and was thus a violation of the constitutional prohibition against the Legislature passing a private or local bill granting to any corporation the right to lay down railroad tracks, etc.

Presumably to cure the defects and overcome the objections pointed out by this decision, the petitioner again applied to the Legislature and obtained (Chap. 411 of the Laws of 1892) an amendment of section 10 of the original act, which provided that the bridge should be " so constructed as to provide for the accommodation and

transportation of passengers and vehicles of every description, for the transportation of freight, and for such other purposes and in such manner as shall in the judgment of the said company seem most desirable." By this act the bridge was to commence east of Park avenue, within one mile of the Grand Central Depot as to its southern arm or approach, with a northern arm "either north or south of the Harlem river, with full authority to the said company to locate and build any other bridges necessary to such approach or approaches." The act required that the construction of the bridge should be commenced before March 3, 1893, to which date the time for the commencement of the construction was extended in terms by the language of the act. It was also provided that the bridge should be completed before March 3, 1900. Section 6 permitted the company to extend the approaches "from its central termination in New York * * * along, over, through and across First or Second avenues for the southerly arm," and also "along, over, through and across First or Second avenues to and across the Harlem river and beyond, so as to connect all existing roads of whatsoever nature, including the location and construction of any bridge over the said river such as may be necessary to its purposes." The act of 1894 (Chap. 212) added a new section to the act of 1892, declaring that nothing in the act should be construed as authorizing the laying of railroad tracks in the streets, and requiring that all openings made by the corporation in the streets be done under the supervision of the department of public works.

In 1887 Congress passed an act authorizing the construction of the bridge, and on March 14, 1894 (28 U. S. Stat. at Large, 44), another act of Congress was passed modifying the requirement of the original act as to the height of the bridge.

By chapter 225 of the Laws of 1893, which was a general law, the right to lay tracks and operate a railway by any company incorporated for the purpose of constructing a bridge connecting any city of more than 1,000,000 of inhabitants with any other city in this State was conferred.

Claiming under these laws the present right to build the bridge and lay down and operate a railway thereon, the respondent commenced this proceeding to acquire the appellant's land for its purposes.

As to work upon the bridge, the first actual construction was, claimed to have been done in the latter part of May, 1888, consisting of the purchase of a schooner load of stone, which was placed as part of the foundation for one of the piers within fifty feet of the wall across the west side of Blackwell's Island.  What was further done is thus testified to by one of the witnesses: "After the stone was deposited on May 28th, I went on, and within a year after that spent a very considerable amount of money on the bridge in engineering and surveying and printing, publishing, engraving, traveling, for engineers and others.  I estimate that the money I had spent from the beginning up to the end of the first year after commencing in 1888, was something like $117,000."  One of the defendant's witnesses testified that in the month of June, 1888, he had gone to the place indicated and that he did not see the stone claimed to have been deposited in May.  It is contended that this court in the former opinion (54 Hun, 400) decided that the placing of the cargo of stone in position was not a commencement of the work.  How far this is sustained is to be determined from the language of the opinion, which, upon this point, says: "The petitioner's own proofs fail to show anything more than preparation prior to the 30th of May, 1888, while the affidavits read on behalf of the city give the 7th of June, 1888, as the precise date when the first cargo of stone was placed upon Blackwell's Island by any representative of the petitioner."  It will thus be seen that the court did not hold that the placing of the stone was not the commencement of the work, but merely decided that the proof did not establish that the stone was placed prior to the 30th day of May, 1888.  Such proof was then in the form of affidavits, while here it is by the oral testimony of witnesses, and we see no reason for disturbing the conclusion of the referee, who upon the evidence before him held that the construction of the bridge "was commenced in due season."

That the Legislature could extend the time for the commencement of the work and waive the forfeiture, was in the former proceeding distinctly held by this court, and by the very language of the act of 1892, as said, such time was in terms so extended, so that we now have the further proof before the court that, on the 1st, 2d and 3d days of March, 1893, certain engineers and laborers in charge of a contractor went on land at the foot of East Sixty-fourth street,

situated on what is known as the proposed exterior street, and commenced work.   At that time the petitioner had paid to the commissioners of the sinking fund of the city of New York the sum of $5,000 on account, and thereby purchased from the city the land and the land under water necessary to the location of its New York piers.   The piers had been previously located by engineers, and on that day they completed their lines and designated to the workmen the location of the piers; the workmen stripped off the earth within the lines designated down to the rock, preparatory to placing the stone for the foundation of the piers.   The space cleared was about fifteen by thirty feet.   Thereafter the company continued to work at construction and built three large coffer dams at the places where its piers are to be placed.   It has all the necessary land for the location of its pier on the Long Island side and has paid the additional amount due the city for the land, namely, $10,300, and is in possession of these four parcels of property, and is proceeding with the actual construction of the necessary piers.

Regarding what has been done, therefore, in the light of the legislation in favor of this company as evidenced by the acts of 1892 and 1894, the case of *People* v. *Manhattan Co.* (9 Wend. 351) is in point: "If (the requirements were) not complied with, then it could not be at all.   The forfeiture, or the right of the State to enforce the forfeiture, was then complete, and the argument is that, as they have since in repeated instances, in solemn and formal acts of the Legislature, recognized the defendants as an existing corporation, they are now estopped from setting up the forfeiture.   The doctrine upon which this argument is founded is a familiar one in the law."

It is claimed by appellant that the vice inherent in the act of 1885 granting to the petitioner the right to lay down railroad tracks is present in the act of 1892; that the terms of the act providing that the bridge "shall be so constructed as to provide for the accommodation and transportation of passengers and vehicles of every description, for the transportation of freight, and for such other purposes and in such manner as shall in the judgment of the said company seem most desirable," confer the same power to lay down railroad tracks as was found in the act of 1885.   In the latter act it was provided that the bridge should be "built for railway, carriage and foot travel."   As shown, the language of the act of 1892 is entirely different, and as it

was undoubtedly passed for the purpose of meeting the very objection which was made to the act of 1885, unless it appears that such power to lay railroad tracks was conferred, it should not be implied from inapt or doubtful language, nor should a construction be placed upon it, if it can be avoided, which would render it unconstitutional.   In other words, it is not disputed that the act of 1892 should receive an interpretation which, if consistent with the intent of the Legislature, would conform it to the Constitution, while it is equally true that the intent of the Legislature is first to be determined from a consideration of the whole act and such other facts as properly may be referred to; and if it then appears that such intent is obnoxious to the constitutional inhibition, the act must fail, the rule being that where there is "room for two constructions, both equally obvious and reasonable, the court must, in deference to the Legislature of the State, assume that it did not overlook the provisions of the Constitution and designed the act  *  *  *  to take effect.   Our duty, therefore, is to adopt that construction which, without doing violence to the fair meaning of the words used, brings the statute into harmony with the provisions of the Constitution." (*Grenada County Supervisors* v. *Brogden*, 112 U. S. 268.   See, also, *People ex rel. Burrows* v. *Supervisors*, 17 N. Y. 241; *People ex rel. Bolton* v. *Albertson*, 55 id. 54.)   We think, therefore, that the law of 1892 does not give authority to the petitioner to lay down railroad tracks upon its bridge.

Another objection made to the act of 1892 is that it offends against section 16 of article 3 of the Constitution, which provides that "no private or local bill which may be passed by the Legislature shall embrace more than one subject, and that shall be expressed in the title."   Chapter 411 of the Laws of 1892 is entitled "An act to further amend chapter 395 of the Laws of 1867, entitled 'An act to incorporate the New York and Long Island Bridge Company for the purpose of constructing and maintaining a bridge over the East river between the city of New York and Long Island.'"   On turning to the act, however, we find provisions, not alone for a bridge over the East river, but for a most extensive system of so-called approaches reaching many miles to the north, and also for connections with certain railroads, which necessarily implies the power to build approaches in other directions, and express authority is given for

the construction and maintenance of a bridge or bridges across the Harlem river.

We think that such provisions in the act are unconstitutional, because the only subject designated either by the title itself, or by a reference to the act of 1867, is the construction and maintenance of a bridge across the East river within a certain locality, and it is that alone which, by a reading of the title, would be suggested to the members of the Legislature or to the public generally. And, while the necessary approaches are authorized, it cannot be successfully contended that indefinite lateral extensions, including bridges over the Harlem river, are a part of such necessary approaches. The constitutional prohibition was directed against this very thing: that is, a private or local bill with a title embracing one subject, and under that guise conferring other and different grants. These, however, are entirely separable and severable from the main and express purpose of plaintiff's incorporation, and can be declared void without impairing the right which has been conferred upon the petitioner to build a bridge across the East river. As said by Judge Cooley in his work on Constitutional Limitations (5th ed. 178): " If by striking from the act all that relates to the object not indicated in the title that which is left is complete in itself, sensible, capable of being executed and wholly independent of that which is rejected, it must be sustained as constitutional. The principal questions in each case will, therefore, be whether the act is in truth truly broader than the title, and, if so, then whether the other objects in the act are so intimately connected with the one indicated by the title that the portion of the act relating to them cannot be rejected and leave a complete and sensible enactment which is capable of being executed." (*People ex rel. Rochester* v. *Briggs,* 50 N. Y. 555; *Matter of Van Antwerp,* 56 id. 261; *Matter of Improvement of Sackett Street,* 74 id. 95.) Construed in the light of this rule it will be seen that the provisions relating to the northern approach, which include, among other things the right to build other bridges over the Harlem river, are not interdependent upon or inseparable from or connected with the subject mentioned in the title, namely, the building of a bridge across the East river. That this is so is shown by a reference to the original act of 1867, in which there is nothing said about such an approach, but authority is given to build a bridge over the East river, and the

plans which form the "Plaintiff's Exhibit Profile and Location," approved by the Secretary of War in 1887, are the plans for the bridge which it would appear the petitioner is now seeking to construct, whole, entire and independent, and providing for no northern arm or approach. While, therefore, we think that the power has not been conferred to build a northern arm with bridges over the Harlem river, and that that portion of the act is unconstitutional, it does not follow that the whole act is thereby rendered invalid, but as the two subjects are entirely separable, and are not inter-dependent, the one which is valid and constitutional, and which was concededly the subject referred to in the title, should be upheld.

Another objection taken is that the act of 1892 is obnoxious to section 20 of article 3 of the Constitution, which reads : " The assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill appropriating the public moneys or property for local or private purposes."

In the volume of Session Laws for the year 1892, issued under the certificate of the Secretary of State, this act is stated to have been " approved by the Governor, May 2, 1892. Passed, three-fifths being present." And the certificates of the presiding officers of the Senate and of the Assembly, attached to the original bill on file in the office of the Secretary of State, also show that only three-fifths were present both in the Senate and in the Assembly. The act authorizes the corporation " to use and occupy so much of the lands under water of the East river, not exceeding in parallel length of frontage on each shore of each channel two hundred and fifty feet, as may be necessary for the location and construction of piers and the anchorages of the bridge to be constructed by it according to the plans approved by the secretary of war, * * * provided that no such pier or anchorage shall extend into the said river beyond the established pier or bulkhead line." Upon this the contention is based that, by a bill which has not received the assent of two-thirds of the members elected to each branch of the Legislature, the property of the State is given for private or local purposes. In the discussion it is assumed that the property referred to belongs to the State ; but in addition to the question whether the defendant can raise this point, the further question is presented as

to whether or not the court will take judicial notice of the fact that the lands under water along the East river are the property of the State. There is no sufficient proof that the title to these particular parcels of land under water is in the State, the evidence being that the plaintiff corporation is in actual possession and occupation as to three of the piers by purchase of the right from the commissioners of the sinking fund, and holds the Long Island pier by purchase and a deed from the riparian owners. Unless, therefore, we assume without proof that the State owns such land, and that by the act it was granted for private or local purposes without the necessary vote of the members of the Legislature, the question is not presented. If, however, we assume that the State owns such lands, then the cases of *People ex rel. Purdy* v. *Commrs.* (54 N. Y. 276), *People ex rel. Adsit* v. *Allen* (42 id. 378) and *People ex rel. Lee* v. *Board of Supervisors* (43 id. 10) would be authorities against the validity of such a grant. On the other hand, we have the case of *Saunders* v. *N. Y. Cen. & H. R. R. R. Co.* (144 N. Y. 75), where it is said : " While the State holds the title to lands under navigable waters in a certain sense as trustee for the public, it is competent for the supreme legislative power to authorize and regulate grants of the same for public or such other purposes as it may determine to be for the best interests of the State," and that " the land which a railroad corporation acquires in this State, though it may be technically called a fee, is for its use as a public highway and this is a use for the benefit of the public, though perhaps the particular purpose for which the grant was made is not very material."

The distinction between the *Saunders* case and those relied upon by appellant would seemingly lie in the fact that while upland property belonging to the State could not be granted, it was competent for the Legislature by a three-fifths vote, instead of a two-thirds vote, to give land under water to different railroad companies upon the ground, *first*, that such land under water was not considered the property of the State, and, *secondly*, because the property so given was neither for a local nor a private purpose. It is unnecessary, however, for us to reconcile the attempted distinctions between these cases, because if there were nothing else but the authorities, assuming that the proper foundation to present the question had been laid by showing that the lands under water were the property

of the State, we should be inclined to the view taken in the cases relied upon by the appellant in holding that, being property of the State, it could not ·be granted without the assent of two-thirds· of the members elected to each branch of the Legislature.

As a matter of fact it has been made to appear by proof that two-thirds of such members voted for the grant, and upon this head the question is presented as to whether the evidence was competent. As stated above, the statement in the Session Laws is to the effect that the act was " passed, three-fifths being present," and a certified copy of the-certificates of the presiding officers of the Senate and the Assembly attached to the original bill on file in the office of the Secretary of State show only the fact that three-fifths were present. Against defendant's objection the plaintiff offered certified copies of the journal of the Senate and Assembly containing the record of the final passage of the act, and a recital of the names of the members in each house voting aye and no.   Such evidence, if competent, showed that the bill received the actual assent of more than two-thirds of the members of the Senate and Assembly.   The question is whether such evidence was competent..   It is provided that " no bill shall be deemed to have been passed by the assent of two-thirds of the members elected to each house unless so certified by the presiding officer of each house."   (1 R. S. 156 [8th ed.], p. 470.   See, also, §§ 2 and 3 of chap. 306 of the Laws of 1842.)   The act of 1892, amending the act to incorporate the bridge company, as it appears in the Session Laws, as already said, has immediately under its title the statement, " Approved by the Governor. May 2, 1892.   Passed, three-fifths being present."   In the case of *Rumsey* v. *N. Y. & N. E. R. R. Co.* (130 N. Y. 88) the certificate of the presiding officer of the Assembly was : " This bill was read the third time and passed, two-thirds of all the members elected to the Assembly being present on its final passage."   It was said (head-note) that "it seems that under the provisions of the act of 1842 (Chap. 306, Laws of 1842), requiring the Secretary of State, when an act as published in ·the Session Laws is certified ' as having been passed by the assent of two-thirds of the members elected to each house,' to state in connection with it as published in the Session Laws that it was passed ' by a two-thirds vote,' and that this statement shall be presumptive evidence that the bill was certified as having been so passed, the presumption thus

created may be overcome by the production of the original certificate showing it was not so passed. But while under the Revised Statutes (1 R. S. 156, § 3), no act shall be deemed to have been passed by a two-thirds vote unless so certified by the presiding officer of each house, a defective certificate which fails to state either way, i. e., as to whether or not the act was passed by a two-thirds vote, is not conclusive to overcome the presumption created by the statement of the secretary in the Session Laws. In such case the journal of the house whose presiding officer has made the defective certificate may be resorted to for the purpose of determining the fact. It seems that it would not be proper to go back of the certificate, if in due form, for the purpose of impeaching it." The provisions of the present law on this subject are contained in chapter 682 of the Laws of 1892 (Art. II, §§ 40, 44), and are as follows: "Section 40. Certificate of presiding officer.— Upon the passage of a bill or concurrent resolution by either house the presiding officer thereof shall append to such bill or resolution a certificate of the date of its passage by the votes of two-thirds of all the members selected to such house, or in the presence of three-fifths of such members, as the case may be. No bill shall be deemed to have so passed unless certified by the presiding officer, which certificate to such effect shall be conclusive evidence thereof."

"Section 44. Statement in Session Laws as to passage of law.— In the publication of every law the Secretary of State shall omit the certificate appended thereto, but shall cause to be inserted immediately under the title of the law a statement to the effect that it became a law upon the properly specified date with or without the approval of the Governor, or notwithstanding his objections, as the case may be, and adding the words: 'Passed by a two-thirds vote,' or 'Passed, three-fifths being present,' in accordance with the certificates appended to the original bill. Such statement shall be presumptive evidence that the original law was certified by the presiding officer of each house accordingly."

If it is competent for the Legislature to enact a rule of evidence, it has seemingly prescribed one by section 40, by which the inquiry into the number of votes cast for any bill must be conducted, as declared, by resort to only one source of information, namely, the original act and certificates or the printed statute book when accom-

panied by the proper statement. Undoubtedly, where there is a defect in form, clerical error or irregularity, it leaves the matter open to inquiry; and in the case of a defective certificate it would seem but reasonable to permit a resort to the journals of either house for the purpose of determining the vote by which a bill was passed. Were we called upon to determine the question here, where no defect, irregularity or error is shown in the statement in the Session Laws or the certificate of the presiding officers, we should be inclined to adopt the view contended for by appellant. But it is unnecessary for us to decide it, and, therefore, with this intimation, we leave it until it is directly presented.

Upon this question we prefer to rest our decision, upon the ground that by the act of 1892 there is no appropriation of public moneys or property for a local or private purpose. It is true that the act authorizes the use and occupation of lands under the water of the East river for the location and construction of piers. It is also provided that "the said bridge shall conform strictly as to * * * the location of its piers and anchorages" to the plans approved by the Secretary of War. Of the four main piers of the bridge, three will rest entirely on land below the low-water mark of the East river, and the fourth will be partly above it. It is insisted that this land belongs to the State of New York in virtue of its sovereignty, and that it is appropriated by this act.

We have already called attention to the fact that there is no proof that this land belongs to the State, and that we cannot take judicial notice of that fact. We know that originally the land between high and low-water mark did belong to the State, but in respect to such land within the limits of the city of New York, the city has claimed and asserted the right to it, and we think we could show, if necessary, that the State has acquiesced in such claim. But it is urged that the grant goes to the extent of permitting the use of lands under water below the low-water mark, and thus, being under the navigable waters of a stream, such land is the property of the State, the grant of which could not be given without the assent of the requisite two-thirds of the members of the Legislature. Our purpose in referring to this matter is to show that the question of title is one which does not lie in conjecture, and cannot be presumed or taken judicial notice of, but should be proved.

The question of whether the lands under water of the East river, either between high and low-water mark or below low-water mark, belong to the State or the city, in our view, is immaterial, because we do not consider the act of 1892 as a grant of any property rights. It certainly would not be seriously contended that in granting the right to place the bridge between certain streets and in certain localities, the intention was expressed on the part of the Legislature to grant the property within the limits fixed. So here, the authority "to use and occupy so much of the lands under water of the East river," etc., is only the conferring of power to do what was necessary to be done in connection with the construction of the bridge, coupled with a restriction that the bridge corporation should not go beyond the exterior pier line, thus locating and defining the situation of the piers, leaving the corporation to proceed in the manner provided by statute for the obtaining of property, and whatever other rights are necessary and requisite for the location and construction of its piers.

It is further insisted by appellant that this corporation being subject to the law regulating the operation of street railroads, the grant of the power to extend the approaches between First and Second avenues is void, because in conflict with that section of the Constitution (§ 18, art. III) which requires the consent of property owners and of the local authorities, and that it has also failed to comply with the requirements of section 38 of the Rapid Transit Act (added by Laws 1892, chap. 102), respecting the consent of the local authorities. This latter section in substance provides that if a company authorized to construct as part of its bridge an approach running in an easterly and westerly direction, should substitute in lieu thereof an elevated railroad, it must comply with the provisions of the Rapid Transit Act by obtaining the consent of the local authorities and the property owners. We think it unnecessary to discuss these objections, because the petitioner is not amenable to the provisions of acts affecting other street or elevated railroads. It is true, as we have seen, that by a general and separate act (Chap. 225 of the Laws of 1893) any company incorporated for the purpose of constructing and maintaining a bridge or bridges over any river, etc., connecting any city containing more than a million of inhabitants with any other city in the State, is empowered to lay tracks

and operate a railway on said bridge or bridges.   If the petitioner has not the right to lay down tracks and operate a railway upon the bridge, pursuant to this law, then it could not take the land of the defendant, which, as the proofs show, is needed for the purposes of the proposed railway.   In its original charter of 1867, the eastern terminus of the bridge did not rest upon or extend to land belonging to any other city, the municipality of Long Island City having been created by chapter 719 of the Laws of 1870.   This we do not regard as fatal to plaintiff's right to lay down railroad tracks upon its bridge; for, considering that since 1870 the bridge contemplated would necessarily connect the city of New York with Long Island City, the petitioner was brought within the provisions of the act of 1893, and obtained the right to lay down tracks upon its bridge.

We have gone over the record of this proceeding bristling with constitutional questions, which have been pressed upon our attention by the appellant with earnestness and ability, but, while some of them are serious, we do not regard any as fatal to the judgment and order appointing the commissioners.   In addition, there were many subsidiary questions which we have not referred to because in our opinion they possess no merit.   Where, as here, the Legislature has repeatedly expressed its intention of conferring the right upon the petitioner to construct a great public improvement, and this has been supplemented by acts of Congress, it is not the duty of the court to take microscopic views of the questions presented, to the end that it may find some means of destroying or impairing the validity of the grant which has been thus conferred, but it is our duty, in a broad and liberal spirit, to carry out, as far as the same can be done consistently with the Constitution and the laws, the legislative will; and where, as here, the forfeitures for failure to comply with certain conditions have been waived by subsequent legislative grants, we think that in the determination of the main question, upon the merits, as to the right to construct the bridge, the legislative intent should have great weight, and, if possible, should be given effect.

Having concluded, therefore, that the objectionable and unconstitutional clauses in the act can be separated so as not to destroy the main purpose, we see no valid reason for disturbing the conclusion

reached by the referee in holding that the petitioner had the right to maintain this proceeding, and the order and judgment entered upon his decision accordingly should be affirmed, with costs.

PARKER, J., concurred in result.

VAN BRUNT, P. J. (dissenting):

I cannot concur in the conclusion arrived at by Mr. Justice O'BRIEN in the case at bar. There are, as it seems to me, many difficulties in the way of allowing the petitioner to exercise the right of eminent domain. It is, however, sufficient to advert to but one, and that is, the constitutionality of the act of 1892 (Chap. 411) amending chapter 395 of the Laws of 1867.

In 1889 the company commenced condemnation proceedings to take certain lands of the city on Blackwell's Island. The city defended these proceedings, and it was held by both Special and General Terms that the act of 1885 (Chap. 392), which amended the act of 1867, attempted to confer the power to lay down railway tracks in violation of section 18 of article 3 of the Constitution, and the grant was, therefore, void. The language of the act of 1885 was: " Such bridge shall not be less than one hundred and fifty feet elevation above average mean tide at middle of each channel of the river and shall be built for railway, carriage and foot travel." The language of the act of 1892 is: " Such bridge shall be not less than one hundred and fifty feet elevation above mean high water at the middle of each channel of the river, and shall be so constructed as to provide for the accommodation and transportation of passengers and vehicles of every description, for the transportation of freight and for such other purposes and in such manner as shall in the judgment of the said company seem most desirable." It seems to me that the language of the act of 1892 would not only authorize the doing of everything which could be done under the act of 1885, but everything in addition thereto which might seem to the company most desirable. It is difficult to conceive language which could have a broader scope than that which was employed in the act under consideration. The company is to build the bridge for the transportation of passengers and vehicles and freight, and for such other purposes and in such manner as in the judgment of said company may seem

desirable.   If the company did construct a railway bridge under the powers attempted to be conferred by this act, and its right so to do was sought to be questioned upon the ground that the language of the act did not confer such power, how is it possible that a court could determine that such power was not conferred? It is manifest, if the question was presented to the court in that form, that there could be but one construction placed upon the act, namely, that the company had the authority to transport passengers and freight by means of a railroad across the bridge.   It must build the bridge to transport vehicles of every description; and such vehicles are to be transported in such manner as to the bridge company shall seem most desirable.   A railway car is a vehicle of some description, and the transportation of such a vehicle upon rails or a railroad is the transportation of such vehicle in some manner, and if that manner is considered most desirable by the company, it is authorized by the terms of this act.   Instead of the amendment of 1892 obviating the objections which were substantiated to the act of 1885, it seems to me it only aggravated such objections by the greater breadth of the language used.

In respect to the claim which is made that the act of 1893 has conferred upon this company the power to erect a railroad bridge, while such act seems to me clearly to be within the restrictions of the Constitution, although there are some decisions which have held to the contrary, yet that act cannot breathe constitutionality into the act of 1892.   The sole authority to construct is derived from the act of 1892, the provisions of which act conferring this power are plainly within the constitutional prohibition.   The petitioner, therefore, has no right to exercise the franchise attempted to be conferred by the act of 1892.

I think the order appealed from should be reversed and the proceedings dismissed, with costs of this court and of the court below.

Judgment and order affirmed, with costs.